SCHRAM GLASS MFG. CO. v. HOMER BROOKE GLASS CO.

(Circuit Court of Appeals, Seventh Circuit. January 25, 1918. Rehearing Denied April 5, 1918.)

No. 2435.

1. PATENTS ⬤⟋328—VALIDITY AND INFRINGEMENT.
    The Brooke patent, No. 723,983, for an apparatus for cutting and distributing molten materials, which automatically cuts an uninterrupted flow of molten glass into a mold when the mold is filled, and supports the severed stream until another mold is brought into place, was not anticipated, discloses patentable invention of a highly meritorious character, and is valid; also *held* infringed.

2. PATENTS ⬤⟋157(1)—CONSTRUCTION OF CLAIMS—QUALIFYING CLAUSE.
    A clause at the beginning of the claims of a mechanical patent, stating the purpose of the device, is not to be ignored as not describing any element, but is a modifying clause, to be read upon every element thereafter described.

3. PATENTS ⬤⟋125—VALIDITY—ABANDONMENT OF APPLICATION.
    The failure of an applicant for a patent to prosecute his application within two years after it was filed does not invalidate a patent afterward granted thereon; such allowance being within the jurisdiction given the Commissioner by Rev. St. § 4894 (Comp. St. 1916, § 9438).

Appeal from the District Court of the United States for the Southern Division of the Southern District of Illinois.

Suit in equity by the Homer Brooke Glass Company against the Schram Glass Manufacturing Company. Decree for complainant, and defendant appeals. Affirmed.

Russell Wiles, of Chicago, Ill., for appellant.

Frederick P. Fish and Charles Neave, both of Boston, Mass., for appellee.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

EVANS, Circuit Judge. From a decree sustaining patent No. 723,983, granted to Homer Brooke, March 31, 1903, holding appellant had infringed it, and enjoining further infringement, this appeal is taken. The defenses are invalidity and noninfringement.

The patent to Brooke relates to an apparatus for cutting and distributing molten materials, particularly glass, and is of particular value to the manufacturer of fruit jars, bottles, and other similar glass objects used by the public in large quantities, the cost of which constitutes an important factor in their successful manufacture. While

---

⬤⟋For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the art of making glass articles is old, it was, prior to Brooke's device, deficient in a particular, an understanding of which is better obtained by a brief general description of the art to which it relates.

In making articles of molten glass prior to this discovery, a considerable quantity of the molten material was taken from a furnace to a mold by a workman, called a gatherer, who, by the use of a "punty" rod, injected into and twisted around in the molten mass in the furnace, first collected and then transferred it to a position over a mold of predetermined size into which the glass ran from the rod. Another workman stood by, and with shears cut this string or stream of flowing glass when directed. The gatherer then twisted his rod, so as temporarily to prevent glass falling off and until another empty mold was supplied, and then the operation was repeated. Machines for receiving this product, containing molds of predetermined capacity, were in common use, and, not infrequently, easy and ready method of substitution of one mold for another was provided. Some devices for receiving the molten mass in the mold, and for the prompt exchange of the molds, were patented, and at least one must be especially considered—the patent to Steimer, No. 549,404, issued November 5, 1895.

[1] Brooke's contribution to the art consisted in producing an apparatus that would better, more rapidly, and more economically convey the molten mass from the furnace to the mold. Instead of the interrupted flow of glass, and the delayed method of transferring with a punty rod this substance from the large reservoir to the mold, in use prior to this discovery, appellee's device permitted the glass to flow continuously from the furnace, and the severing knives were made to act automatically, and means for supporting the severed stream were provided; the accumulated flow being poured into the opening of the next presented mold. The characteristic claims are as follows:

Claim 1: "An automatic device for cutting or separating an unsupported freely flowing stream of molten material into unformed molten masses, the same comprising a cutting knife and means for moving the same and means for supporting the severed stream of continuously flowing material."

Claim 3: "An automatic device for cutting or separating a flowing stream of molten material into unformed molten masses, the same comprising a cutting knife and the means for moving the same, and means for discharging the said molten masses into suitable receptacles."

Claim 4: "An automatic device for cutting or separating a flowing stream of molten material into unformed molten masses of predetermined quantity, the same comprising a knife and means for moving the same, a plurality of receptacles, and means for discharging the said molten masses into said receptacles."

Claim 5: "An automatic device for cutting or separating a flowing stream of molten material into unformed molten masses, the same comprising a knife and means for moving the same, a plurality of receptacles, *means for discharging the said molten masses into said receptacles*, and means for intermittently moving said receptacles into position to receive cut-off masses."

Claim 6: "An automatic device for cutting or separating a flowing stream of molten material into unformed molten masses, the same comprising a knife and means for moving the same, and means for causing the said cutting device to temporarily support the molten stream."

The device is herewith shown in Fig. 1, the sequence of position of cutting knife and receptacles in the operation of severing the molten glass stream being illustrated.

*37* is a conduit which aids in conducting the glass from the furnace to the receptacle *30*. The cutting knife *23* is cup-shaped, one side of which is provided with a cutting edge *24*. Another knife which moves in the opposite direction, consists of blade *27*, carried on the end of an arm, extending from the hub (the arm and hub not being shown in the figure), all working automatically. When the constantly flowing stream of glass has filled the mold, the two blades come together as shown in B, the stream is cut, and the knife passes to the position C. While the glass is momentarily supported in the cup-shaped receptacle, as shown in figure C, an empty mold is being brought into position underneath. In D, the tilting operation has been completed and the molten glass has been discharged from the receptacle into the mold underneath. The knife and the cup-shaped receptacle then resume their normal position by the action of gravity. The molten mass proceeds to flow into the mold next succeeding. While this is not all of the machine, it describes the mechanism of its more important parts.

The distinct contribution to the art was so obvious that appellant concedes patentability to Brooke's discovery, but claims that a process and not an apparatus discovery is disclosed. It contends that, an apparatus patent having been issued, it was invalid in view of the prior art, which contention calls for a consideration of the Steimer patent, designated by its patentee as a "glass measuring apparatus," but claimed by the appellant to be capable of being used so as to meet all of the specifications and claims found in the Brooke patent.

Figures 3 and 4 appearing below describe the material part of the Steimer apparatus, which, appellant claims, is capable of performing the same function described in Brooke's patent, and is anticipatory of the claims therein set forth.

We employ language from appellant's brief to describe the Steimer apparatus:

"In the Steimer machine there is a plate 2, with a central measuring opening 3 precisely like the corresponding opening in defendant's liner machine. In the normal position of the parts shown in Fig. 3, of the Steimer patent a plate 5 lies beneath the hole 3 in the plate 2 and a funnel or cup-shaped opening 6 in an upper plate 4 registers with the opening 3. Glass is flowed into the measuring receptacle 3 with the parts as shown in Fig. 3. The upper and lower plates are then moved by the operator to sever the glass in the measuring opening 3 from the stream above it, and immediately thereafter the hole 7 in the lower plate 5 registers with the measuring opening 3, so that the cut-off mass falls into the mold beneath (Fig. 4). This is precisely what happens in the defendant's liner machine. Now it is quite true that Steimer contemplated completely filling the opening 3, while defendant does not do so, and it is quite true that Steimer contemplated an intermittent stream from a punty rod instead of the continuous stream; but it is equally true that if a continuous stream were supplied to the Steimer machine, it would do exactly what defendant's liner machine does. *If a continuous stream were fed into the cup-shaped receptacle 6 in the upper plate 4 of Steimer, it would flow into the measuring receptacle when the parts were in the position shown in Fig. 3, and immediately they move to the position shown in Fig. 4 the stream would be cut off and husbanded on the upper surface of the plate 2 precisely as in defendant's liner machine,* and on the return of the parts to the position shown in Fig. 3 the accumulated gob would drop into the measuring opening 3."

Whether Brooke's apparatus patent is valid, in view of the prior art as disclosed in the Steimer patent, is the chief question for consideration on this appeal. Appellant rests its case on these two propositions: (a) If the prior art disclosed a device of like construction, capable of performing the same function as the patent in suit, even though the inventor had no idea of making use of his apparatus for such a purpose, the patent is anticipated. Carnegie v. Cambria, 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968. (b) Steimer's device will do the very things claimed for Brooke's apparatus. In other words, appellant admits that Steimer's "orifice" was for a measuring device, and admits that Steimer had no idea of using a "continuous flowing stream of glass, cutting and temporarily supporting it," but that, because Steimer's machine was capable of being so used, it anticipated Brooke's structure, and the latter's patent cannot be saved by reason of the fact that a process was disclosed which was patentable.

Would Steimer's apparatus do the things which can be done by a device embodying the claims of the Brooke apparatus? The pith of appellant's contention lies in the italicized portion of the foregoing quotation. Unfortunately for appellant, Steimer described the operation of his machine (and we believe the only possible operation) specifically in the specifications to his patent. He said:

"The operation is as follows: The mold 8 to be charged with glass is placed under the plate 2, beneath the position of the hole 3, and the plates 4, 5, are moved, so as to bring the holes 6, 3, into register. The gathering boy then introduces into the hole 6 with his punty enough molten glass to fill the cavity 3, and by means of the operating lever 6 the plates 4, 5, are moved so as to bring the holes 3, 7, into register and to move the hole 6 away from the hole 3. The movement of the hole 6 away from register with the hole 3 shears off the glass in hole 3 from the glass on the workman's punty, leaving in the hole 3, enough glass to fill the same accurately, and the movement of the hole 7 into register with the hole 3 causes the glass to drop from the latter into the mold 8 below."

Describing his drawings he said:

"In the drawings, 2 represents a plate having formed there through a measuring cavity 3, downwardly flaring in form. 4 and 5 are two plates, mounted, respectively, on the top and bottom of the plate 2, and connected so that they may be moved simultaneously back and forth in contact with the plate 2. The top plate is formed with a hole 6 and the bottom plate with a hole 7, said holes being situate so that they shall register with the hole 3 at respectively opposite ends of the travel of the plates 4 and 5—i. e., when the hole 6 is in register with the hole 3, Fig. 3, the hole 7 shall be out of register, and that when the holes 7 and 3 are in register the hole 6 shall be out of register, Fig. 4. The hole 3 is made of proper size to contain the amount of glass required to be delivered to the mold."

This construction renders impossible the operation described by appellant in case a continuous stream were fed into the cup-shaped receptacle 6. The cup-shaped receptacle 6 is not stationary, and the successful operation of this glass measuring apparatus is made to depend upon the movability of plates 4 and 5. Under such a structure a continuous stream could be fed into the cup-shaped receptacle 6 only in case the stream itself moved similarly to plate 4, and even then it is doubtful whether the stream of molten glass would follow the movement of the receptacle 6 so as to prevent any portion of the glass falling on the surface of plate 4, instead of in the receptacle 6.

Appellant's expert witnesses have suggested, by drawing and otherwise, that the opening 6 in plate 4 might be so enlarged that, notwithstanding the movement of this plate 4, a portion of the opening 6 would be always under the continuously flowing stream. The suggestion comes as a result of the Brooke patent. The structure shown in Figs. 3 and 4 does not warrant any such suggestion. Referring to such drawings it will be observed that the opening 3 is under the flowing stream. When the opening 6 is moved to position shown in Fig. 4, the stream of molten material, if uninterrupted, would fall, not in opening 6, but upon the plate 4. Neither the drawings nor the method of operation described in the specifications of the Steimer patent, permit of, or suggest, a use of the opening 6 in plate 4 for receiving "an unsupported freely flowing stream of molten material."

We conclude the Steimer apparatus is not capable of being so used as to take care of a continuously flowing stream.

[2] It is further contended that Brooke's discovery, if patentable, was not covered by the claims in question. To reach this conclusion appellant asks us to ignore the first clause of the claim, which is as follows:

"An automatic device for cutting or separating an unsupported freely flowing stream of molten material into unformed molten mass."

Appellant contends that this is a mere statement of a process, and has no place in a mechanical apparatus, and should be entirely disregarded when appearing in a claim of an apparatus patent. With this conclusion we cannot agree. While it is true that this clause of itself does not describe an element in the combination, it should not for that reason be ignored. Each of the elements of the combination should be read in the light of this clause and should be modified by it. Such a clause of itself may entirely fail to supply a necessary element in a combination (American Envelope Co. v. A. W. P. Co., 152 U. S.

425, 14 Sup. Ct. 627, 38 L. Ed. 500) yet it may so affect the enumerated elements as to give life and meaning and vitality to them, as they appear in the combination. So, in this case, the legitimate and fair construction of the claims, particularly in view of the specifications and drawings, requires us to read on each element of this claim the clause which appellant insists is a superfluity. In so doing we are not substituting an operation for an element, nor including as an element the particular article upon which the apparatus is to work. We are merely giving to the modifying clause the same effect that would be given to an adjective or adverb that limits, enlarges, or qualifies the word it modifies.

Whether Brooke, at the time he made his discovery, was not also entitled to a process patent, we need not consider, for it is not before us. Nor are we required to devote time to the question of the patentability of Brooke's discovery, for in appellant's brief we find the following language:

"This use of the knife blades for the dual purpose of severing the stream and husbanding it while the molds are changed was new with Brooke, or at least Brooke increased the husbanding to a very material extent; that is, from the slight husbanding of Picard, Schulze-Berge, to a substantial amount—great enough to absorb all glass flowing during the relatively long period of mold shift."

Such a concession (justified by the record) clearly and justly credits to Brooke the discovery of an apparatus that would take care of "an unsupported freely flowing stream of molten material," which is the essence of the value of this discovery.

[3] Appellant further urges that the application for a patent was abandoned in the Patent Office, and this contention is based on plaintiff's failure to prosecute his application within the period fixed in the statute. This contention must be rejected in view of the decision in Western Glass Co. v. Schmertz Glass Co., 185 Fed. 791, 109 C. C. A. 1. Appellant cites Steward v. American Lava Co., 215 U. S. 162, 30 Sup. Ct. 46, 54 L. Ed. 139, to the contrary, but the cases are distinguishable and are not in conflict. Section 4892, R. S. (section 9436, Comp. Stat. 1916), under consideration in Steward v. American Lava Co., supra, requires an amended application for the patent to be verified, and makes no exception, and grants to the Commissioner no discretion. The Commissioner of Patents in the present case was not outside of his jurisdiction when he acted on appellee's application, filed more than two years prior thereto, for section 4894, R. S. (section 9438, Comp. Stat. 1916), expressly reserves to the commissioner the right to issue patents after such period.

Claims 3, 4, and 5 are especially attacked, because no basis for them is disclosed in the specifications or drawings. It would serve no useful purpose to reproduce here the drawings or to quote at length from the specifications. We have carefully read the specifications and examined the drawings with the criticism in mind, and find ample support for the claims in both the drawings and specifications.

Appellant's device so clearly infringes appellee's patent that no discussion of this phase of the case will be indulged in.

The decree is affirmed.