HOMER BROOKE GLASS CO. et al. v. HARTFORD–FAIRMONT CO.

(District Court, D. Connecticut.  February 18, 1919.)

No. 1465.

PATENTS ☞328—INFRINGEMENT—MACHINE FOR CUTTING MOLTEN GLASS.

   The Brooke patent, No. 723,983, for an automatic device for cutting or separating a flowing stream of molten material, particularly glass, *held* not infringed by a machine having a distinctly different principle of operation.

In Equity.  Suit by the Homer Brooke Glass Company and the Owens Bottle Machine Company against the Hartford-Fairmont Company.  Decree for defendant.

Frederick P. Fish, of Boston, Mass., and Charles Neave, of New York City, for plaintiffs.

John P. Bartlett and Thomas Ewing, both of New York City, for defendant.

THOMAS, District Judge.  This is the usual bill in equity, alleging that letters patent No. 723,983 were granted to Homer Brooke on the 31st day of March, 1903, upon an application filed March 5, 1898, and charging the defendant with infringement, and praying for an injunction and an accounting.  The defenses are invalidity and noninfringement.

The invention, as stated in the specification, relates to—

"devices for cutting or separating molten material, and especially is designed for cutting a stream of flowing molten glass into unformed molten masses of predetermined quantity and distributing the same into suitable receptacles."

The bill charges infringement of claims 1, 2, 3, 4, 5, 6, 7, and 9, but at final hearing counsel for plaintiffs withdrew consideration as to claims 1, 2, 6, 7, and 9, and now relics on claims 3, 4, and 5, which are as follows:

"3. An automatic device for cutting or separating a flowing stream of molten material into unformed molten masses, the same comprising a cutting knife and means for moving the same, and means for discharging the said molten masses into suitable receptacles.

"4. An automatic device for cutting or separating a flowing stream of molten material into unformed molten masses of predetermined quantity, the same comprising a knife and means for moving the same, a plurality of receptacles, and means for discharging the said molten masses into said receptacles.

"5. An automatic device for cutting or separating a flowing stream of molten material into unformed molten masses, the same comprising a knife and means for moving the same, a plurality of receptacles, means for discharging the said molten masses into said receptacles, and means for intermittently moving said receptacles into position to receive the cut-off masses."

In a suit brought by the Homer Brooke Glass Company against the Schram Glass Manufacturing Company (249 Fed. 228, 161 C. C. A. 264), the Circuit Court of Appeals for the Seventh Circuit has held the claims here in issue to be valid, and the decision in that case is

sufficient answer to that portion of the defendant's answer which alleges invalidity, especially in view of the fact that no new evidence of such controlling importance as to compel a different conclusion has been here offered in support of the alleged invalidity. So that infringement is the only question to be here discussed and decided.

The decision here to be given will be contained in the answers to two questions: First, Does the defendant treat a flowing stream of molten glass? and, second, Does the defendant's cutting device cut, support, and discharge, or cut and discharge, the cut-off portion of the molten masses? These questions will be considered in their order.

We can do no better here, in explaining briefly the purpose of the Brooke device and the difficulties of prior methods in manufacturing glass which Brooke sought to overcome, than to quote from the opinion of Judge Evans in the Schram Case, supra. On pages 228 and 229 of 249 Fed. (161 C. C. A. 264, 265) he said:

"The patent to Brooke relates to an apparatus for cutting and distributing molten materials, particularly glass, and is of particular value to the manufacturer of fruit jars, bottles, and other similar glass objects used by the public in large quantities, the cost of which constitutes an important factor in their successful manufacture. While the art of making glass articles is old, it was, prior to Brooke's device, deficient in a particular, an understanding of which is better obtained by a brief general description of the art to which it relates. In making articles of molten glass prior to this discovery, a considerable quantity of the molten material was taken from a furnace to a mold by a workman, called a gatherer, who, by the use of a 'punty' rod, injected into and twisted around in the molten mass in the furnace, first collected and then transferred it to a position over a mold of predetermined size into which the glass ran from the rod. Another workman stood by, and with shears cut this string or stream of flowing glass when directed. The gatherer then twisted his rod, so as temporarily to prevent glass falling off and until another empty mold was supplied, and then the operation was repeated. Machines for receiving this product, containing molds of predetermined capacity, were in common use, and, not infrequently, easy and ready method of substitution of one mold for another was provided. Some devices for receiving the molten mass in the mold, and for the prompt exchange of the molds, were patented, and at least one must be especially considered— the patent to Steimer, No. 549,404, issued November 5, 1895.

"Brooke's contribution to the art consisted in producing an apparatus that would better, more rapidly, and more economically convey the molten mass from the furnace to the mold. Instead of the interrupted flow of glass, and the delayed method of transferring with a punty rod this substance from the large reservoir to the mold, in use prior to this discovery, appellee's device permitted the glass to flow continuously from the furnace, and the severing knives were made to act automatically, and means for supporting the severed stream were provided; the accumulated flow being poured into the opening of the next presented mold."

On page 230 of 249 Fed. (161 C. C. A. 264) will be found a clear and brief description of the operation of the Brooke device, so that it is not necessary now to do more than refer to it; but from the brief description, as well as the description of the operation of the Brooke device disclosed by the specification, it is clearly apparent that a continuously flowing stream of glass, flowing by gravity, is the kind and character of stream which Brooke handles in the patent in suit.

The stream of flowing molten material and the stream of flowing molten glass are frequently referred to in the specification. The mech-

anism embraces an automatic device for cutting a flowing stream of molten glass, means for discharging the same, and means for shifting the molds to receive the severed glass, and reference in the specification is made a number of times to the cutting knives acting upon the flowing stream.  The specification finally concludes by saying:

"Of course it will be understood that I do not limit myself to the precise construction of devices here illustrated, as I consider myself to be entitled to broadly cover all means for cutting or separating *a stream of flowing molten material into unformed* molten masses and *discharging* the cut-off portions."

The claims in suit are for an automatic device for—

(3) "Cutting or separating a flowing stream of molten material."
(4) "Cutting or separating a flowing stream of molten material."
(5) "Cutting or separating a flowing stream of molten material."

The claims not in issue are also directed to the same mechanism fed in the same way and they refer to—

(1) "An unsupported freely-flowing stream."
(2) "An unsupported freely-flowing stream."
(6) "A flowing stream."
(7) "A continuously flowing stream."
(8) "A continuously flowing stream."
(9) "A continuously flowing stream."
(10) "A continuously flowing stream."
(11) "A continuously flowing stream."
(12) "A continuously flowing stream."
(13) "A continuously flowing stream."
(14) "A continuously flowing stream."

So the evidence is conclusive that Brooke was engaged in solving the problem respecting the best method for handling and cutting off a stream of molten glass, steadily and continuously flowing from one receptacle to another without break or interruption, the flow of which is prompted or induced by no other means than the force of gravity.

It appears that the difficulty in the manufacture of glasswares and the efficient and economical handling of molten glass has been a problem which the manufacturers have endeavored to solve, and no doubt this problem has presented many engineering difficulties.  The molten glass is viscous, and difficult to handle mechanically.  Brooke solved the problem by treating or handling successfully the continuously flowing stream of molten glass.

The defendant claims that it also has solved the problem, only in an entirely different way and upon an entirely different engineering theory.  It claims that its machine in no way treats or handles a continuously flowing stream, or a flowing stream, or stream of molten glass. It claims that its problem of engineering proceeds along entirely different lines and ideas, apart and entirely distinct from the principle disclosed in the Brooke patent.  It claims that its machine more nearly approaches the hand punty method, in that a separate gather is obtained, somewhat similar to the gob or gather obtained under the old hand punty method, and thus a better result is obtained in the finished product.  The defendant claims that it does not treat a flowing stream, but rather a gather or gob, a distinct entity, with each

cycle of operation of its machine, and that its engineers entirely abandoned the Brooke idea, and developed an entirely new principle.

The evidence is conclusive that the Brooke cutting device and the defendant's machine are radically different in theory and in operation, and they certainly are in no way similar in appearance or operation. In the Brooke device the molten glass is allowed to escape through a hole in the bottom of the furnace, and it flows continuously without any interruption as soon as the plug is withdrawn to allow the molten glass to escape from the furnace through the conduit and eventually to the molds, and this flow is continuous until the operation is stopped by inserting a plug to stop the flow.

But in the defendant's machine there is no hole in the bottom of the furnace to allow a stream to flow by gravity. The molten glass is held within the furnace and cannot escape until mechanically propelled over the lip of the dam by means of the paddle, because the crest of the spout is above the normal level of the molten glass in the tank. The spout is peculiarly constructed in order to aid in giving desired preformation to the gob. The spout is filled at each dip of the paddle. When the machine is put in operation, the paddle must make more than one stroke in order to get the full amount of glass over the dam, because there is glass always sticking to the paddle, and the walls of the spout and one paddle stroke will not supply the requisite gather or gob to hang off from the end of the spout. But, after the paddle and spout are once covered with glass, a separate stroke of the paddle is required for each separate batch delivered. The paddle does not deliver enough glass into the spout in a single stroke for two successive batches. There will be some glass left hanging in the spout after a paddle stroke, the same as there is some glass left on the end of a punty rod after the gather on the end of it has been cut with the shears.

The paddle is attached to the operating mechanism of the machine, and its operation is timed by means of gears and cam shafts. The paddle adjustment determines the amplitude of the stroke, and this varies accordingly as the article to be manufactured is large or small, requiring a large or small batch of molten glass to make it, and thus, in some respects, approaches the old hand punty method, or it is arranged so that a longer or shorter time may elapse between the delivery of the paddle-dipped glass to the spout and the severing thereof below the end of the spout, so that without change of weight of gob, if a relatively long time elapses, the gob will be long, and if a short time elapses, the gob will be short.

The gob is thus made to hang off the end of the spout, as it does off the end of a punty rod, until in connection with the amount delivered, the *walls* of the spout and the relation of the most forward position of the paddle to the shear movement, the *gather* acquires the desired preformation. After the predetermined quantity of molten glass is thus forced or pushed over the dam, the gather or batch is cut off by means of knives coacting and quickly severing the gob, and these knives in no way support, or even tend to support, the molten glass as it is severed by the knives, so quick is their operation.

The paddle then resumes its backward movement, and in doing so draws backward with it this viscous material, and nothing is dropping or flowing from the lip of the dam, but a small portion is supported on the lip of the dam, which becomes part of the next gather or batch, when the paddle pushes it over the dam during the next cycle of operation. This operation is repeated, and each cycle of operation produces a separate and distinct batch of molten glass.

Moreover, the evidence is conclusive, and it is not disputed, that the level of the molten glass in the furnace is always below the level of the dam, so that no glass can flow over the dam, and none passes over the dam, except as the paddle, in performing its functions in the cycle of one complete operation, pushes a predetermined quantity over the dam; and this is, as I view it, a separate gob or gather, is not a flowing stream, and in no way an operation similar to that employed by Brooke. The engineering is along different lines. It avoids the theory adopted by Brooke. It does not treat a "stream"—"a flowing stream"—a "continuously flowing stream." It deals with a separate entity, and that entity is the batch which is pushed over the lip of the dam by the paddle in its downward, forward, and backward movement in performing the work which devolves upon it. The severed mass then finds its way, by force of gravity, through a trough to the proper mold, where it is pressed into whatever article is being manufactured.

Having thus disposed of the first question respecting the flowing stream of molten glass, let us proceed to discuss and decide the second question presented.

If by any manner of means this molten glass going over the dam of the defendant's machine be construed to be a stream, still the defendant does not infringe, because the cutting knives on the defendant's machine perform one function only. They cut. They do nothing more. They perform, as nearly as possible, the function of the shears used in the old hand punty method. They do not support or husband the flowing glass, nor do they in the least discharge the cut-off portion. Under the theory which the defendant employs to cut the molten glass, the action of cutting must be and is nearly instantaneous. To be exact, the proof shows the time consumed in the cutting to be $1/20$ of a second, and the time required for the complete cycle of operation of the machine to be 2 seconds, during $1^{19}/20$ seconds of which the shears are at rest.

The plaintiff's cutting operation involves more than mere cutting. In describing this operation in the Schram Case, supra, on page 230 of 249 Fed., on page 266 of 161 C. C. A., Judge Evans said:

"The cutting knife 23 is cup-shaped, one side of which is provided with a cutting edge 24. Another knife which moves in the opposite direction, consists of blade 27, carried on the edge of an arm, extending from the hub (the arm and hub not being shown in the figure), all working automatically. When the constantly flowing stream of glass has filled the mold, the two blades come together as shown in B, the stream is cut, and the knife passes to the position C. While the glass is momentarily supported in the cup-shaped receptacle, as shown in Figure C, an empty mold is being brought into position underneath. In D, the tilting operation has been completed and the molten glass has been discharged from the receptacle into the mold underneath. The knife and

the cup-shaped receptacle then resume their normal position by the action of gravity. The molten mass proceeds to flow into the mold next succeeding."

On page 1, line 58, in the specification of the patent in suit, the patentee says:

"The upper series of knives consist of cup or trough shaped receptacles having a cutting edge and are designed to *cut* the stream of flowing molten glass *and* momentarily *lift* the same *and discharge* it into a receptacle beneath."

Respecting the claim based upon this construction, the patentee says:

"What is claimed as new is:
(3) "An automatic device for cutting * * * a flowing stream, * * * the same comprising
"(a) A cutting knife;
"(b) Means for discharging the molten mass."
(4) "An automatic device for cutting * * * a flowing stream, * * * the same comprising
"(a) A knife;
"(b) Means for discharging the molten mass."
(5) "An automatic device for cutting * * * a flowing stream, * * * the same comprising
"(a) A knife;
"(b) Means for discharging the molten mass."

A careful examination of all the evidence, therefore, discloses that the knives of the patent in suit cut, support, and discharge. From the claims in suit it appears that the knives cut and discharge. From the operation of the device it appears that the knives cut, support, and discharge.

It is conceded that the knives cut. The cup-shaped knife supports the flowing stream while other operations of the machine are taking place and while the stream continues to flow. After supporting the stream—even momentarily, as Judge Evans finds in the Schram Case —the cup-shaped knife discharges the accumulation into the mold underneath. So it appears that the conclusion is imperative that the knives, when the machine is operating practically must support the stream during the interval of the mold shift, and that what is thus caught or husbanded must be discharged into the mold, and the cup-shaped knife performs this function.

The defendant's mechanism neither supports nor discharges. It simply cuts. There is no support. There is no discharge in which the knives play any part. Instantly on being cut, the severed portion falls by gravity onto a swinging trough, and the cut-off portion is automatically deposited in molds presented to receive it.

I can no better state my own views and conclusions respecting the patent in suit than to incorporate in this opinion the concluding paragraph of the defendant's brief as expressing briefly and tersely these views and conclusions:

"A fair review of the patent in suit, the art relating thereto, and the testimony in this case demonstrates a distinct departure by defendant's machine from the machine of the patent in suit—a departure in construction and in mode of operation. Defendant's entire system is a different system from that of the patent in suit, founded on a different conception as to the way

automatically to handle glass, worked out by a different method of automatic molten glass delivery, and involving apparatus different in construction. Brooke had his old flowing stream delivery patented apparatus. He was yoked to a flowing stream feed, and got up the apparatus of his patent in suit to handle a flowing stream feed. But defendant's engineers, after study of the situation, purposely and for sound physical reasons, turned away from the fundamental idea of Brooke. To them that did not seem to be the best way automatically to feed molten glass. They determined that they wanted a feed that would afford delivery to the shears of a preformed gob— not an unformed mass cut off from a flowing stream. So they invented and brought to successful commercial practice their unique machine, which forces masses of glass by separate paddle strokes into a specially designed spout, where the mass may stretch down, as from a punty end, and form a gob, never permitting the mass to break out of control into a flowing stream. The gob, preformed as a gob, is automatically cut off from the mass hanging from the spout as, prior to Brooke, it had been automatically cut from the mass hanging from the punty."

Further discussion seems unnecessary: The defendant does not infringe. The bill may be dismissed, with costs to abide the event.