**NORDBERG MFG. CO. v. WOOLERY MA-CHINE CO.**

No. 5405.

Circuit Court of Appeals, Seventh Circuit.

Oct. 31, 1935.

Norman S. Parker, of Chicago, Ill., and Leon F. Foley, of Milwaukee, Wis., for appellant.

Andrew E. Carlsen, of Minneapolis, Minn., and Warren G. Wheeler, of Milwaukee, Wis., for appellee.

Before SPARKS and ALCHULER, Circuit Judges, and BRIGGLE, District Judge.

SPARKS, Circuit Judge.

The questions here involved are the validity of claims 1, 2, 8, 10, 14, 16, and 22, and the infringement of claims 8, 14, 16, and 22 of United States patent No. 1,-807,367, issued to Woolery on May 26, 1931. The District Court held that all said claims were valid and infringed and were not anticipated. From that ruling this appeal is prosecuted.

The invention relates to bolt tighteners for railway rails. Its primary objects are: (1) To provide a portable power-operated machine that can be quickly and easily mounted on and dismounted from the rails, and which can readily be moved longitudinally on the rails so as to be successively shiftable from one rail joint to another; (2) to provide a machine, of an efficient and practical nature, for selectively tightening or releasing the nut on the bolt, on whichever side of the rail the nut may be; (3) to provide a bolt tightener in

which the tightening pressure will be automatically released when it reaches a predetermined degree, so as to insure a uniform holding pressure by each bolt, and in which at the same time the operator may effect an adjustment to eliminate the automatic pressure release and provide a positive power drive which may be employed to twist off a bolt which can not be removed or adequately tightened; (4) to provide an improved construction of a wrench and the supporting and driving mechanism therefor; (5) to provide an efficient power transmitting mechanism, including speed clutches and drives, for conveying and regulating motive power from an engine at one end of the machine to the tool or wrench holders preferably arranged at or near the other end of the machine.

For the purpose of discussion, the claims may be divided into three groups. Claims 1, 2, and 10 which relate generally to a machine for travel and work on a railway will be referred to as the "tumbling claims." [1] They contemplate a protection to the machinery and describe weight distribution and rocker support combinations which facilitate hurried tumbling and removal of the machine from the track in case of an approaching train, and facilitate replacement on the track when the train has passed.

Claims 14 and 16 relate to a rail machine having a tool or rail working mechanism in combination with a pivoted, shiftable frame structure for transversely shifting the tool with respect to the rail. They are referred to as the "tool shifting claims." [2]

Claims 8 and 22 relate to the mechanism for transmitting power from the engine to the socket wrenches and are designated as "power transmission claims." [3]

Appellant admits that certain of its devices infringe claims 1, 2, and 10, providing those claims are valid, but denies their validity. It asserts that the only feature of the tumbling device, referred to in the "tumbling claims," is the use of hoop-shaped rockers or guards which permit the device to be tilted off the rail and which may act to protect the structure when it is tilted. It argues that tilting a device by means of rockers, and protecting it by means of a guard when it is tilted on its

---

[1] "1. A machine of the character described comprising a frame adapted to be supported and travel on a pair of rails, and with its center of gravity substantially above one of the rails whereby the entire machine may be quickly tumbled off the rails, and longitudinally spaced rockers for supporting the machine when tumbled from the rails.

"2. A machine of the character described, comprising a portable frame adapted to be supported at its front and rear ends upon a rail and with the center of gravity of the machine substantially above the rail, laterally extending means for normally retaining the machine in an upright position, a track working tool and power unit carried by the frame, and rockers carried by the frame for supporting the machine when tumbled from its normal upright position."

"10. A machine for working on rail tracks comprising a frame to be carried on a track, a motor and track working mechanism carried on the frame, and rockers secured to the frame and extending therefrom to protect said motor and mechanism when the machine is tumbled from the track."

[2] "14. A rail working machine comprising a main frame for supporting a rail working mechanism and having a support at its front end for engagement with the rail, a roller for supporting the rear end of the main frame, and means for transversely shifting the rear end of the main frame with respect to the roller so as to adjust the rail working mechanism laterally with respect to the rail."

"16. A rail working machine comprising a main frame for supporting a rail working mechanism and having a support at its front end for engagement with the rail, a roller for supporting the rear end of the main frame, and means for vertically and transversely adjusting the main frame with respect to the roller."

[3] "8. In a machine of the character described, a power driven shaft, a rail tool adapted to be driven thereby, and a power transmission device for transmitting power from the shaft to the tool including means for automatically disengaging the power when the resistance of the tool reaches a predetermined degree, and means for rendering said disengaging means inoperative when it is desired to apply a positive force to the tool irrespective of the resistance thereof."

"22. A bolt tightener comprising a power unit, a wrench, a power transmission device including high and low speed connections for transmitting power from the unit to the wrench, and means for disengaging the low speed connection when the resistance to the wrench reaches a predetermined degree."

side is mere mechanical skill and not invention. It further insists that these claims cover the application of spaced rockers to any track working machine, for supporting the machine when tumbled from the tracks. We do not so read these claims. They are restricted, and contemplate a use only in connection with a rail working machine so designed that its center of gravity will be disposed substantially above one rail of the track. Claim 2 adds the feature of the lateral extension or outrigger which as a support contacts the other rail, thus maintaining the machine in a normal operative position. Claims 2 and 10 have additional limitations which relate to the motor and track working mechanism carried by and forming a part of the machine. It is argued, however, by appellant that the motor and track working mechanism limitations of claims 2 and 10 have no cooperative association with the remaining elements, and that they constitute mere aggregation. It can not be denied that the tumbling features of the claims have no advantage, or but very little, in a machine used on a track where no trains are running, but it is clear that there is quite an advantage in their use where trains continue to operate, and the advantage is more apparent in cases where there are blind curves or other obstructions to the workman's view. The rockers also have the further advantage of enabling the operator to replace the machine in proper operative position, and they also protect and guard the mechanism.

We think there is a definite cooperative association between the rockers and the laterally located center of gravity of the machine proper, and the same may be said with respect to the outrigger which maintains the machine balance on one rail, when in operation, and may be gripped and manipulated to roll the machine off the track and back onto it by one operation. In Sachs v. Hartford Electric Supply Co. (C. C. A.) 47 F.(2d) 743, 748, it is said, "The co-operation of the means necessary to create an invention is to be measured by the purpose to be fulfilled, not by the interaction of the parts. Each factor must indeed be a condition to that result, but the whole may be a mere assemblage; the co-operation between them all may be no more than their necessary presence in a unit which shall answer a single purpose." In Standard Oil Co. v. Southern Pacific R. Co. (C. C.) 48 F. 109, 110, the court said, "It is sufficient if all the devices co-operate with respect to the work to be done, and in furtherance thereof, although each device may perform its own particular function only." In Forbush v. Cook, 9 Fed. Cas. 423, No. 4,931, the court said, "To make a valid claim for a combination, it is not necessary that the several elementary parts of the combination should act simultaneously. If those elementary parts are, so arranged that the successive action of each contributes to produce some one practical result, which result, when attained, is the product of the simultaneous or successive action of all the elementary parts, viewed as one entire whole, a valid claim for thus combining those elementary parts may be made."

Appellant also contends that the "tumbling" claims are anticipated by the French patent to Wageor, No. 559,433; the United States patent to Hankinson, No. 1,247,674; and United States patent to Reid, No. 1,478,256. While the Wageor device resembles that of the Woolery patent, he discloses no rocker elements for facilitating removal and replacement of the machine and for protecting the mechanisms when tumbled from the track. While the courts have never refused to consider a foreign patent merely because it was foreign, yet it is to be measured as anticipatory, not by what might have been made out of it, but by what is clearly and definitely expressed in it. Carson v. American Smelting & Refining Co. (C. C. A.) 4 F.(2d) 463, 465. The court in that case said, "An American patent is not anticipated by a prior foreign patent, unless the latter exhibits the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of making experiments." As applied to the patent in suit, we think Wageor's patent can not be said to anticipate. Wageor was cited in the Patent Office, and regardless of that fact, the "tumbling" claims were allowed. That action by the Patent Office officials is entitled to great weight. Although not absolutely binding, it is to be overcome only by clear proof that the patent officials were mistaken and that the combination lacks patentable novelty. J. A. Mohr & Son v. Alliance Securities Co. (C. C. A.) 14 F.(2d) 799.

The Hankinson patent relates particularly to a vehicle especially adapted for

use in playing auto polo; and the Reid patent relates to a device for tilting an automobile for the purpose of painting and repair. In each, the purpose sought to be accomplished and the methods used were quite dissimilar to those of the patent in suit. The problems solved were entirely different, and we think they were in non-analogous arts. We therefore hold that claims 1, 2, and 10 are valid.

The "tool shifting" claims, 14 and 16, are not limited to any particular rail working mechanism, but call for means for adjusting the main frame of a rail working mechanism with respect to the rail. Claim 14 describes a rail working machine in which a main frame supports a rail working tool or mechanism, and is in turn supported over the rail by a support or outrigger at its front end, and a roller at the rear end. The frame is swingable from its front end so that the rear end is transversely shiftable with respect to the roller, so as to adjust the rail working mechanism laterally with respect to the rail. By turning a hand wheel at the rear, the entire rear end of the machine is shifted laterally so that the nut wrenches can be moved into engagement with the rail bolt nuts at either side of the rail, and when the operation on the nut is completed the wrench may be laterally disengaged from the nut. Claim 16 is similar to claim 14 except that the former provides means for vertically lifting the rear or wrench end of the frame.

As anticipatory of these claims appellant cites the Link-Belt locomotive crane, the Ingersoll-Rand power plants, and United States patents to Armstrong, No. 1,-234,115; Billings and Greenleaf, No. 1,-322,478; Jacobs, No. 891,700; Kimball and Appleton, No. 370,147; Harbot, No. 1,-093,848; Venning, No. 1,231,102; and French patent to Wageor, No. 559,433. The Link-Belt locomotive crane is just what the name implies; the Armstrong patent is a power driven shovel or scoop; that of Billings and Greenleaf is a loading machine. The Jacobs patent discloses a track car and tool driving machine by which the rails are spaced, and holes are driven by power into the ties by an operator at the front end of the machine, while at the same time another operator at the rear of the machine, by power from the same source, drives the screwed spikes into the holes thus made. The device of Harbot is likewise a screw-driving machine for

securing rails upon ties; those of Venning and the French patent (Wageor) are track grinding machines. The Ingersoll-Rand device is a pneumatic tie tamping outfit, with which a wrench for rail bolting is operable, but in no such manner as could be said to anticipate appellee's device. The same may be said of Kimball and Appleton. All of the devices cited disclose a lateral and vertical motion of the working member, but all save the two last mentioned are in non-analogous arts. It should be noted also that the French patent to Wageor was cited in the Patent Office and held not anticipatory.

The real question here is whether the claims are infringed by appellant's device; and it is urged by appellant that patentee can not interpret claims 14 and 16 to cover appellant's structure without rendering the claims anticipated by the earlier structures. Appellant contends that instead of mounting the wrench socket on the main frame, it mounts it at the end of a boom which may be readily raised and lowered and swung laterally by a single operator by means of coil springs which normally hold the boom raised above the rail level. It is insisted that there are no means in the Nordberg structure for moving the main frame laterally in relation to the supporting rollers, and that there are no means for raising or lowering the main frame in relation to the rear end rollers on which it is supported, or for raising or lowering the upper frame for rotation about a vertical pivot in relation to the main frame. In other words, appellant positions its tool at the end of a boom which is mounted for horizontal rotation about a secondary frame, which in turn is pivoted for rotation about a vertical axis on what appellant designates as the main frame. Appellee contends, however, that the secondary frame which appellant refers to in its device is in fact its main frame, and the frame which is referred to as the main frame is the secondary or small frame, and by so doing it is said that appellant seeks to avoid infringement because what it designates as its main frame does not shift.

The main frame of the patent is described as including the beams connected by various parts of the machine particularly including the engine base, cross bars and gear and shaft housing. It also comprehends the short rear frames and associated parts, including the shaft which

slides through the roller during the shifting movements. In other words, the main frame supports the transmission mechanism, engine and other working parts. In appellant's structure the two rail wheels are connected by a small sub-frame or tie bar device which supports a pivot bolt at one end, and an arcuate cross rail near the other end. This is what appellant refers to as his main frame. It is comparatively very light, and no part of the mechanism is secured directly upon it. The engine, the wrench arm, the reverse clutch, the overload release, the control devices, the rockers and all other operating mechanisms are mounted on and secured directly on the large cast frame, which weighs about five hundred pounds, and this is the frame which appellant designates as the sub-frame. We think it is clear that appellee's contention must prevail that what appellant designates as its sub-frame must be considered the main frame. Thus considered, appellant's entire machine pivots from a point at the back, permitting the wrench arm to be shifted to either side to reach the nuts on both sides of the rail. In the patent the two track wrenches are face to face and spaced apart with the rail between them, while in the Nordberg machine the two wrench sockets are back to back, thus making it necessary to raise the entire wrench arm over the rail to reach opposite sides of it.

A comparison of claim 14 with appellant's structure convinces us that there is infringement. "A rail working machine" we think includes appellant's power track wrench which has precisely the same purpose as the machine of the patent. The machine under the claim comprises "a main frame for supporting a rail working mechanism." In appellant's device this main frame must be considered the large cast frame, which appellant refers to as the sub-frame, and the rail working mechanism supported thereon is the wrench arm. The claim then refers to the main frame as "having a support at its front end for engagement with the rail." This support is the roller which is under that end of appellant's device most distant from the operator. The claim then continues "a roller for supporting the rear end of the main frame." This is the rail engaging truck roller closest to the operator, and in appellant's device it carries the large frame portion above it, and permits it to be transversely shifted on the arcuate cross

track. The claim then concludes with "means for transversely shifting the rear (or operator) end of the main frame with respect to the roller so as to adjust the rail working mechanism laterally with respect to the rail." In the patent this is done by turning a hand wheel, while in Nordberg it is done by manually moving the wrench socket laterally to its proper engagement with the nut, which is easily accomplished by reason of the boom being held suspended over the rail by large coiled springs.

Claim 16 is generally quite similar to claim 14. In addition to the transverse shift adjustment it provides for vertical adjustment of the frame for the purpose of lifting the wrench mechanism. Both adjustments are present in Nordberg, although accomplished by specifically different means. Instead of tilting the entire mechanism as does Woolery, Nordberg only lifts that portion of the main frame or machine which comprises the wrench arm extension. It is urged by appellant that this does not meet the limitation of the claim. It will be observed, however, that Woolery's main frame is not entirely lifted, but only the front end, for the rear end has a fixed pivot. The functions of the adjustments in both machines being identical, we are convinced that the vertical adjustment of Nordberg constitutes an equivalent of the corresponding adjustment of the patent, and claim 16 is therefore infringed, as well as claim 14.

In discussing claims 8 and 22 it is quite necessary to keep in mind the work to be done and the objects sought to be attained. Prior to Woolery's disclosure, rail nuts were tightened by hand. What was needed and what Woolery claimed to have invented was a power machine: (1) That would quickly and easily run up the nut on the bolt; (2) that could, if necessary, tighten the nut to a bolt tension of twenty thousand pounds; (3) that would automatically release the power application at any predetermined degree of resistance, so that all the bolts would be of uniform tightness, thus not placing more tension on some than on others; (4) that would, by rendering the automatic release inoperative, twist the bolt completely off. These results seem to have been accomplished by the patent disclosure as well as by appellant's structure and by the commercial machines sold by both appellant and appellee. In each, the machine has an engine

near one end, a pair of rail nut wrenches at the other end, and a mechanism for transmitting power from the engine to the wrenches.

The significant features with respect to claims 8 and 22 are that the machine must be of the general character referred to and must have (1) an engine (or a power driven shaft), (2) a wrench (or rail tool), (3) a power transmission mechanism from one to the other, including (4) means for automatically disengaging the power when the resistance of the tool reaches a predetermined degree. Claim 8 includes (5) means for rendering the disengaging means inoperative when it is desired to apply a positive force to the tool irrespective of the resistance. Claim 22 does not include the last named limitation, but does provide for (6) high and low speed connections in the transmission.

As anticipatory of these claims appellant relies upon Evans, No. 1,562,442; Rowe, No. 748,018; Errington, No. 927,028; Backscheider, No. 1,299,570; Hollingshead, No. 1,298,504; Crane, No. 123,382; Jacobs, No. 891,700; Harbot, No. 1,093,848; and Kimball and Appleton, No. 370,147. The first four are directed to claim 8, and all are directed to claim 22. Evans discloses an overload safety device applicable to a wide variety of machines and its purpose is to disconnect an excessive load of power in order to prevent breakage of parts. Clearly this was not the purpose of Woolery. His was to effect a *uniform* tightness of nuts, and he made no claim to an overload release, merely as such. The trial court quite properly stated that a unit of the prior art (such as shown in Evans) can not anticipate a new and useful combination in which such unit only constitutes a single element of the combination claim. Rowe, Errington and Backscheider disclose other power driven tools having releases, but it is obvious that their purposes were not to secure tightness or results in the work contemplated, but rather to prevent motor stalling or breakage, and even in Rowe's release lockout there is no suggestion of a purpose to twist off a rusted or frozen object. Each of the devices last referred to is a hand tool intended for use in a shop or on a machine. They very slightly, if at all, relate to the problems which confronted Woolery and they do not comprehend the specific combinations of claims 8 and 22. A witness of appellant who testified

to the earlier use of Errington's friction release said that to his knowledge it had never been applied for the specific purpose of tightening nuts on rails, and if geared so as to apply 20,000 pounds of pressure the washers would soon burn up with continual slipping.

Kimball and Appleton is a track bolting machine but it does not directly or indirectly disclose or suggest the automatic pressure release to secure uniform tightness of the bolts. It was suggested, however, by appellant's witness that Kimball's belt could be employed to release pressure, but he suggested no provision, nor did those patentees, for adjusting it, so that such release would operate at any predetermined degree of bolt resistance, and it is obvious that such belt release could not be locked out or rendered inoperative so as to apply a positive bolt-breaking force to the tool. An examination of the remaining references convinces us that they are either in non-analogous or unrelated arts, or merely show some element of the combination claimed by appellee.

The District Court's ruling in sustaining the claims in suit was explicitly based upon the principle that the first clause of the claims, "in a machine of the character described" should be constantly considered in determining the question of anticipation. That premise is sound. By it the scope of the patent is limited, and by it the patent is protected against alleged anticipations. This court has held claims valid in which elements were literally met in some non-analogous use device, but where the reference was intended to operate for a different purpose and object, and did not answer the introductory clause of the claim. Duncan v. Stockham (C. C. A.) 204 F. 781; Schram·Glass Mfg. Co. v. Homer Brooke Glass Co. (C. C. A.) 249 F. 228; Benoit v. Wadley Co. (C. C. A.) 54 F.(2d) 1041. These decisions are supported by the following: Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Consolidated Roller-Mill Co. v. Walker, 138 U. S. 124, 11 S. Ct. 292, 34 L. Ed. 920. We hold that the District Court's ruling was correct in sustaining the validity of claims 8 and 22.

It is contended by appellant, however, that its structure does not infringe these claims. It attempts to distinguish its automatic overload release combination from that of the patent, and to differentiate the high and low speed characteristics as

found in both structures, but which are not specifically defined in the claims. Both machines are admittedly in the same art and field of use. It is clear that appellant's device responds to "In a machine of the character described" of claim 8, and to "a bolt tightener comprising a power unit" of claim 22. It is likewise clear that appellant's device has a "power driven shaft, a rail tool adapted to be driven thereby" of claim 8, or "a wrench" as defined in claim 22. The power transmission as described in claim 22 includes "high and low speed connections for transmitting power from the (power) unit to the wrench." Appellant's structure likewise discloses high and low speed connections in its transmission train, and in its literature, appellant states that "The machine has two socket speeds, a high of 71 R.P.M. and a low speed of 25 R.P.M., at which there is sufficient power to * * * even twist off a heat treated bolt."

The automatic overload release, or bolt tension regulator, is described in claim 8 as "means for automatically disengaging the power when the resistance of the tool reaches a predetermined degree." In claim 22 it is referred to as "means for disengaging the low speed connection when the resistance to the wrench reaches a predetermined degree." Appellant also employs an overload release unit, upon the importance of which we find in its literature the following statements: "An adjustable overload release tightens every nut to the same tension. This is automatic." "A feature that will appeal to all maintenance men * * * is the design of the adjustable overload release. This can be set to give any desired bolt tension with assurance that every bolt will have the same uniform tension. * * *" " * * * no effort on the part of the operator is required to secure uniformly tightened joints." "The outstanding feature." From these statements it would appear that the purpose, function and result of appellant's machine were identical with those of the patented structure. However, appellant insists that the operating principle, and the acts required to be performed by the operator, and the operative steps in the employment of the two machines are different. We think the District Court was correct in finding there was no difference. It is quite true that in claim 8 the automatic release device is for "disengaging the power" without regard to high or low

speed, while claim 22 places the power only in the "low speed connection." Upon this concession appellant contends that it has no means for disengaging its drive or its power transmission. It seems to us that appellee completely refutes this contention by stating that if the contention be true then appellant has no overload release. It is urged by appellee, however, that appellant does employ means for disengaging its power transmission. With that statement we are in accord, for when appellant's overload release responds to the predetermined tension or bolt resistance, the overload release cam spreads and passes within the arms of the overload release, thereby spreading certain springs which effectively and actually disconnect the driving gear from the driven gear.

With respect to claim 22 appellant contends that its overload release has no direct relation with the low speed drive, but it is obvious that appellant's high and low speed gears are in the transmission train between the common cross shaft and the wrench, and both are directly driven by the overload release unit. Appellant's witness who devised and constructed its machine admitted this to be true. He further stated that while it was intended to operate only on high speed, yet it could operate on low; that the overload release is in the low speed connection when the low speed connection is operating; and that by loosening the springs of the overload release sufficiently, it could be used to tighten bolts, and stop at a predetermined tension. He further stated that the overload release in appellant's machine is primarily used to relieve the pressure on the bolt when tightening it; that whether using appellant's or appellee's machine the overload is in the speed connection that is tightening the nut, in one case in high, and in the other in low; that in either case it is the speed connection, and it is in the same speed in both cases.

The concluding limitation in claim 8 is "means for rendering said disengaging means inoperative when it is desired to apply positive force to the tool irrespective of the resistance thereof." The purpose of this is to provide in the power transmission a means to render inoperative the automatic tension release, so that instead of stopping the power it will continue until the bolt twists off. Obviously, this is what appellant does, and it employs two methods in doing it. The first method is

by changing the speed or gear ratio, so that by increasing the speed of the overload release unit with respect to the wrench, the ratio of bolt resistance back to the release will be greatly lessened, hence the torque power transmitted through the release device will be proportionately increased even to the bolt-breaking point. The second method is to tighten up the nut on the lower end of the overload release spring bolt so that the spring will be tightened up to a point where it will not permit spreading of the overload release arms. These methods are made quite clear by the testimony of appellant's witness who devised and constructed its machine.

The language of each claim should be defined in the light of the meaning given it by the patentee, with an appreciation of the purpose and object of the element in the patented structure. Sanitary Refrigerator Co. v. Winters (C. C. A.) 24 F. (2d) 15. Patents are not limited to the structure described and shown, but having described his invention and shown its principles, a patentee is deemed to claim every form in which his invention may be copied, unless he manifests an intention to disclaim with respect thereto. Simplex Appliance Co. v. Star Can Opener Co. (C. C. A.) 37 F.(2d) 491. The test of infringement is whether the accused device does substantially the same work in substantially the same way and accomplishes the same result. One appropriating the principle and mode of operation of a patent, and obtaining its results by the same or equivalent means, may not avoid infringement by making a device different in form, even though it be more or less efficient than the patented device. Stearns-Roger Mfg. Co. v. Ruth (C. C. A.) 62 F. (2d) 442.

It is contended by appellant that the Woolery machine responding to the claims relied upon was put into public use more than two years prior to the filing date of the application, hence it urges that all claims of the patent are invalid. That conclusion is claimed to be supported by the testimony of appellee's witness, Smart, who testified from memory as to events occurring ten years prior thereto. The court thought that the witness inadvertently antedated the events by a year and that conclusion was abundantly supported by the evidence. But conceding that it was not thus supported, the court found that the events which Smart described occurred during the period of experimental work and did not amount to a public use, and that finding is supported by a preponderance of substantial evidence.

We think the District Court properly found the claims valid and infringed.

Decree affirmed.