EVERSHARP, INC., a corporation, and The Parker Pen Company, a corporation, Plaintiffs,

v.

FISHER PEN CO., Inc., a corporation, and Paul C. Fisher, Defendants.

Civ. A. No. 56 C 77.

United States District Court
N. D. Illinois, E. D.
Nov. 7, 1961.

Raymond L. Greist and Raymond E. Fidler, Chicago, Ill., for plaintiffs.

William A. Marshall, Merriam, Smith & Marshall, Chicago, Ill., for defendants.

PERRY, District Judge.

1. This Action was filed by Eversharp, Inc., a Delaware corporation (hereinafter referred to as Eversharp), against Paul C. Fisher and Fisher Pen Co., Inc. (hereinafter referred to as Fisher Pen Co.) on January 12, 1956, for infringement of United States Letters Patent Nos. 2,390,636, 2,397,229, 2,400,-679, and 2,416,896, all of which were duly and legally issued on inventions made by one Laszlo Jozsef Biro, and were thereafter acquired by Eversharp.

2. On November 21, 1958, The Parker Pen Company, a Wisconsin corporation (hereinafter referred to as Parker) was joined as a party Plaintiff, Parker having acquired the patents in suit from Eversharp as of December 31, 1957, including all rights of recovery for past infringement.

3. On October 14, 1959, Eversharp and Parker filed an Amended and Supplemental Complaint, charging infringement of additional Parker-owned pat-

ents, Nos. 2,428,854 and 2,580,753 covering project-retract mechanisms.

4. On February 23, 1961, said patents, Nos. 2,428,854 and 2,580,753, together with said Biro patent 2,400,679, all covering project-retract mechanisms were, by stipulation of the parties, withdrawn without prejudice from this suit, leaving only Biro patents '636, '229 and '896 involved herein.

5. Defendants, in answering the original Complaint, filed a counterclaim charging Eversharp with misuse of the patents in suit, and in answering the Amended and Supplemental Complaint charged both Eversharp and Parker with misuse of the patents in suit. Eversharp has been retained as a party to this suit only for the purpose of adjudication of defendants' Counterclaim.

6. Paul C. Fisher is the owner, president and manager of Fisher Pen Co. (Fisher 917), an Illinois corporation which manufactures, distributes and sells ball point pens and ball point pen refill cartridges. Paul C. Fisher is also the owner of Pen-Pal, Inc., a California corporation which manufactures points for ball point pens, and he is the owner of William Pen Co., operating out of Forest Park, Illinois, which merchandises ball pens manufactured by Fisher Pen Co. (Fisher 91–93). From 1950 until 1954 Paul C. Fisher operated a sole proprietorship which manufactured and sold ball point pens and refill cartridges (Fisher 930).

7. The defendant, Paul C. Fisher, formed Fisher Pen Co. in 1954 for the purpose of continuing the activities of his sole proprietorship, i. e., the manufacture and sale of ball point pens and refill cartridges (Fisher 930). Mr. Fisher owns all of the outstanding stock of Fisher Pen Co., he is president and manager, he has personal control of the administration and management of that company, he is the guiding spirit of that company, he is the dominant or sole moving force, and he is the active controlling head of that company. As such, Mr. Fisher directed the activities of Fisher Pen Co. from the time of its inception, and he acted both before and after forming Fisher Pen Co. with full knowledge of the existence of the patents here in suit when he participated in and directed the manufacture and sale of infringing ball point pens and refill cartridges. It is clear that he used the other defendant, Fisher Pen Co., to carry on the infringement.

8. The patents in suit have to do with ball point pens, the '636 patent covering a ball mounting and ink feeding arrangement, the '229 patent broadly covering a continuous ink vein capillary type reservoir, and the '896 patent covering an improved form of continuous ink vein capillary reservoir.

9. The defendants Fisher Pen Co. and Paul C. Fisher have both manufactured and sold ball point pens and refill cartridges identified by plaintiffs as Type A (Fisher 75, 987) in the United States during the period beginning six years prior to the filing of the original Complaint in the present suit.

10. The defendant Fisher Pen Co. has also manufactured and sold ball point pens and refill cartridges identified by plaintiffs as Types A, B, C and D in the United States during the period beginning six years prior to the filing of the Amended and Supplemental Complaint in the present suit (Fisher 88, 89, 991, 992).

11. The defendant Paul C. Fisher has also manufactured and sold ball point pens and refill cartridges, including points of the type embodied in DX 526, in the United States during the period beginning six years prior to the filing of the original Complaint in the present suit (Fisher 947).

12. For years many people, both in the United States and abroad, had endeavored without success to devise a satisfactorily operable writing instrument using a ball as the writing element (Fehling 1529) but the ball point pen, as we know it today, originated with Laszlo Jozsef Biro, the patentee of the three patents in suit, who, at the time he

conceived these basic inventions, was a Hungarian living in Argentina. Biro was neither an engineer nor a scientist. He was a journalist who, in 1943, pioneered in a new direction in the writing instrument field to produce and market the first commercially successful ball point pen, the principles of operation of which are illustrated and described in the three patents in suit (Fehling 1506, 1885, 1886).

13. Thousands of these Biro-made pens were sold during the first year (Martin 184) and they performed satisfactorily (Fehling 1507).

14. Once the practicability of a ball point pen incorporating the features he had devised had been demonstrated by Biro, the demand for the same was immediate, and beginning in 1944 many United States companies, including Parker, Eversharp, Eberhard Faber, Reynolds, Hamilton Ross, Eagle and Sheaffer vied for the United States rights to Biro's inventions (Martin 172), with Eberhard Faber and Eversharp finally succeeding in obtaining licenses (Martin 175) under the United States patent rights. Eversharp later acquired outright title to these United States patent rights at a cost of over $1,000,000 (Christensen 290).

15. In April of 1946 Eversharp put its first ball point pen on the market (Christensen 286, 295) calling it the Eversharp CA ball pen (Christensen 296), which pen employed the channeled spherical seat construction of the '636 patent (Exhibits 59, 60 and 61) and a continuous ink vein reservoir having the features disclosed in the '229 patent (Christensen 297).

16. The impact of the ball pen on the writing instrument field was extremely great, and a large number of new companies, as well as the old line pen and pencil manufacturers, quickly entered the business of manufacturing and selling ball pens in accordance with the teachings of these patents (Christensen 297–307). Many of these companies were granted licenses under the Biro patents in suit by Eversharp, and royalties in excess of $600,000 were paid under these licenses up to the time the patents were acquired by Parker (Christensen 308). Over $275,000 in royalties has been paid under these patents since Parker acquired them. Many other companies who did not take licenses were sued by Eversharp and stopped manufacturing. A number of other suits are now pending for infringement of these patents.

17. The Biro inventions were financed by Mr. Henry G. Martin, a British subject living in Argentina, who appeared as a witness at the trial, and who now controls the foreign patents corresponding to the Biro patents here in suit. He testified that he receives the equivalent of over $2,000,000 per year in royalties from the foreign ball point pen patents (Martin 162).

18. At Christmas time in 1945, shortly before the Eversharp CA pen came on the market, Reynolds put out the first ball point pen which was sold commercially in the United States. The Reynolds pen used a different seating arrangement from the '636 patent and a different reservoir than that disclosed in either of the '229 or '896 patents; the first Reynolds ball seat had no radiating channels between any spaced spherical seat sections (Lovejoy 1793) and the reservoir was a large diameter tank type reservoir with a porous plug, the purpose of which plug was to prevent the ink from leaking out of the rear end of the reservoir when the pen was inverted (Fisher 922).

19. The writing quality of the Reynolds pen without channels in the seat was satisfactory only when the pen was new; during use it quickly deteriorated to a very poor writing pen (Lovejoy 1811). The defendant, Paul C. Fisher, manufactured parts for this Reynolds pen and did research work on the Reynolds point which later was modified to incorporate distinct channels intentionally (or artificially) produced in the seat as taught by Biro in the '636 patent, and as used in the Eversharp CA pen which was then on the market.

Many other companies, including Scripto, have experimented with and tried to market ball point pens utilizing seat organizations different from that of the '636 Biro patent, but such seats were unsatisfactory and were quickly replaced with the Biro seat (Lovejoy 1772).

20. Once the Biro inventions covered by the patents in suit became known to the public, large numbers of people and companies began experimenting with ball point pens and devising new and different types of seats and reservoirs, as evidenced by the large number of patents which were applied for shortly after Biro's pen came on the market. Prior to Biro's invention there were approximately 100 ball point pen patents in existence, and today there are almost 4,000 which were filed after 1944 (Fehling 1529).

21. In 1947, before going into the business of manufacturing ball point pens on his own, Paul C. Fisher examined a great many of the ball point pens which were then on the market (Fisher 1155) and, as Fisher himself testified, all of these had the intentionally and artificially produced channels separating the ball seating area into a number of individual seat sections (Fisher 1164, 1165).

22. At about the time that the defendant Paul C. Fisher began to manufacture and sell ball point pens and refill cartridges, he was aware of the patents in suit (Fisher 984, 985). He knew that these patents were of concern to the other manufacturers in the field who were making ball point pens and refill cartridges substantially like those that he was manufacturing, and yet without making an infringement investigation as to whether his proposed products infringed these patents, he proceeded to manufacture and sell ball point pens and refill cartridges using the teachings of the Biro patents in suit. Fisher's testimony was simply that he was advised that he "had nothing to worry about" (Fisher 1037).

23. For many years, the defendant Paul C. Fisher manufactured and sold ball point pens and refill cartridges, and the defendant Fisher Pen Co. manufactured and sold ball point pens and refill cartridges which included points manufactured by various other companies, including Anja Engineering Co. and Hartley Pen Co. (Fisher 946); all of these pens and refill cartridges, with the exception of a very few channelless seats which were sold by Fisher, utilized the well defined channels of the Biro seat and the continuous ink vein capillary reservoir.

24. All of the ball pens produced from the time when Biro first put his pen on the market until some time in 1950 used an oil base ink similar to nondrying printers' ink which, as described in the patents in suit, is viscous. These pens wrote and still write satisfactorily (Fehling 1687, 1688). In the opinion of Mr. Lovejoy, Vice President of Scripto, Inc., "oil based ink used in a ball point pen having the channel seat has produced the best writing ball pen the industry has ever seen" (Lovejoy 1770).

25. The oil base viscous inks used by Biro and described in the '636 patent were no secret (Fehling 1514); they were well known in the printing trade in 1943 (Fehling 1687) and were known to the writing instrument industry, but such inks were never of any value to the mechanical writing instrument industry until Biro invented the ball pen point disclosed in the '636 patent (Lovejoy 1776). Seats (PX 189, 190, 191) made in almost exact conformance to Fig. 1 of the '636 patent were demonstrated at the trial (Fehling 1704) and wrote satisfactorily (PX 197) with printing inks (PX 189, 190, 191) available on the market. These printing inks are not specially designed for nor are they intended to be used in ball pens, and yet the pens wrote satisfactorily with them.

26. The oil base viscous ink initially used by Biro and which was used by the ball pen industry in general until 1954, did not dry very readily upon exposure to air and, consequently, it tended to be messy, and a line written with such ink could be transferred from one sheet

to another (Fehling 1687 and Lovejoy 1770).

27. In about 1950 a glycol ink was developed (Fisher 930) which, being fast drying, was cleaner in use than the oil base inks and was not subject to transfer. This new ink became available to the trade in 1954 (Fisher 935) and it is now universally used in the ball pen industry (Fehling 1686) because of its fast-drying qualities.

28. The same basic Biro seat and reservoir are still used today, even though the ink has been changed. Some small increase in the clearance around the ball may be required in order to accommodate the new fast-drying ink (Fisher 940).

29. The accused structures which plaintiffs selected as representative of those manufactured and sold by defendants have been identified as Types A, B, C and D—Type A being illustrated in PX 21 and 21a, Type B in PX 22 and 22a, Type C in PX 23, and Type D in PX 24.

30. The claims of the Biro patents asserted as infringed by the accused structures are claims 1, 2, 3 and 6 to 11, inclusive, of the '636 patent, claims 12 to 21, inclusive, of the '229 patent, and claims 4 and 11 to 14, inclusive, of the '896 patent.

*Claim 10* of the '636 patent is representative of the asserted claims of that patent and reads as follows:

"In a writing instrument of the type having a freely-rotatable writing ball and a reservoir from which ink is fed to the ball, the improvement which comprises a socket for the ball in the front end of the instrument provided about its bottom with a plurality of circumferentially-spaced generally spherical ball seating sections with which the ball conforms over substantial areas, a single ink-feeding conduit connected with the reservoir and opening into the center of the bottom of the socket, and a plurality of ink-feeding channels in the socket between said ball seating sections, said channels opening at their rear ends into the conduit and at their front ends into the socket forwardly of said sections, said socket being provided at its edge with a ball-retaining rim in forwardly-spaced relation to said ball seating sections, and said ball being spaced from the walls of the socket at all points other than at said rim and said ball seating sections."

*Claim 21* of the '229 patent is representative of the asserted claims of that patent and reads as follows:

"A reservoir for holding a substantial quantity of ink for use in writing implement of the type having a writing ball rotatably mounted in a socket and a feed channel opening forwardly into the socket; said reservoir comprising an ink-holding conduit which is adapted to hold the major part of the charge of ink for the writing implement in the form of a continuous vein, said conduit being adapted to be connected at one of its ends with said feed channel and being provided at its other end with a vent, and said conduit being of such cross-sectional area relative to the flow characteristics of the ink as to maintain the continuity of the ink vein irrespective of the position of the writing implement."

*Claim 14* of the '896 patent is representative of the asserted claims of that patent and reads as follows:

"In a ball point writing instrument, for use with a semi-fluid ink, a writing tip containing a forwardly opening socket, a ball rotatably mounted in the socket, and a duct of considerably less diameter than the socket, which duct opens forwardly into the socket behind the ball and opens rearwardly into an ink holding reservoir; an elongated pen-shaped housing having a forwardly tapering front end portion in which the writing tip is positioned, said housing being hollow for the greater part of its length rearwardly of the writing tip

and being vented to the atmosphere; and an ink holding reservoir encased within the hollow portion of the housing, which reservoir comprises a plain longitudinally extending one-piece tube of small diameter and generally uniform cross section, which tube is structurally independent of the housing and is removable therefrom; said tube having a diameter which is but a small fraction of the diameter of the main portion of the housing, and having an internal cross sectional area which is substantially larger than said duct; said tube being connected at its front end to said duct and being provided at its opposite end with an opening which is subjected to the atmospheric pressure within the housing; said tube being adapted to hold the main supply of ink for the pen and being of such small interior cross sectional area relative to the flow characteristics of the ink with which it is adapted to be used as to maintain the ink in a continuous vein, which vein when the instrument is charged with ink will commence at said ball and will extend rearwardly therefrom without interruption through said duct and tube, irrespective of the position in which the instrument may be placed."

31. The '636 patent discloses a novel combination of features (Fehling 1540-42, 2063). These features, and the manner in which they were combined by Biro to interact functionally with each other, are:

(1) The provision of a plurality of circumferentially spaced spherical ball seating sections or areas, which sections conform in shape with the ball and are wholly surrounded by ink passages—much like separate islands in a lake of ink;

(2) The provision of ink channels between the spherical seat sections, which channels branch off from a central feed duct and end forwardly of the seat sections;

(3) The provision of an annular ink holding cavity which is located forwardly of the spherical seat sections, between the latter and the rim portion, into which cavity the channels between the seat sections open at their front ends; and

(4) The provision of a single centrally arranged feed duct behind the ball, from which feed duct the channels between the spherical seat sections branch off and discharge into the annular cavity in front of the seat sections.

32. It is the combination of these features which is new and which produces a new result, even though each of these features, when taken separately, is of no consequence. Only when all of these features are combined together is there produced a ball pen point which lays down a continuous and relatively uniform layer of ink and which is commercially acceptable (Fehling 1540, 1541, 1627–1630).

33. The absence of any one of these four features from the combination is not catastrophic in the sense that the resulting point will not operate at all, but it will not work nearly as well as the Biro point of the '636 patent and its operation is unsatisfactory from a commercial point of view (Fehling 1628–1629). The difference between incorporating all four features in a seat and incorporating less than all four is the difference between success and failure; the '636 seat is commercially satisfactory, but the prior art seats are not. This is demonstrated by the fact that all successful ball point pens have employed these four features of the Biro point. Even today, eighteen years after Biro's invention, every ball pen on the market uses a seat organization which incorporates these same four features.

34. The channels which are shown in the drawings of the '636 patent, described in the specification and defined in the claims, are actual channels which are intentionally provided at specific locations in the socket. They are clearly something different from any minute

surface imperfections which may or may not appear initially in the surface of the socket as a result of uncontrollable variations in the manufacturing process. Mr. Fisher himself testified that all of his points include channels having a depth which he accurately controls (Fisher 1238), and when he attempted to replace these well-defined, dimensionally controlled channels with accidentally produced surface irregularities, the resulting points were unsatisfactory (Fisher 1179).

35. Claims 1, 2, 3 and 6–11, inclusive, of the '636 patent are directed to and define a new and patentable combination of functionally cooperating elements, which combination would not have been obvious to one skilled in the art, based on a knowledge of the prior art patents and publications introduced in evidence by defendants.

36. These claims are clear, concise and definite definitions of the invention made by Biro, and the drawings and written description are sufficiently specific, clear and definite as to enable one skilled in the art to practice the invention (Fehling 1878).

37. The ball pen points manufactured by Paul C. Fisher (DX 526) and the ball pen points exemplified by Types A, B, C and D, all embody the combination of features taught by the '636 patent and they infringe claims 1, 2, 3 and 6–11, inclusive, thereof.

38. The defendants have cited a large number of prior art patents illustrating ball pens known prior to the filing date of the '636 patent. None of these prior art disclosures anticipates the invention set forth in the asserted claims of the '636 patent, nor would any of these disclosures properly have suggested to a person skilled in the writing instrument art, at the time of the invention thereof by Biro, Biro's ball pen point as defined by claims 1, 2, 3 and 6–11, inclusive (Fehling 1714, 1715).

39. None of the references cited is more pertinent to the validity of the claims of the '636 patent than the references considered by the United States Patent Office experts and over which those experts considered the claims clearly patentable as evidenced by the allowance thereof.

40. The references which defendants have relied on as anticipatory of the asserted claims of the '636 patent are: Feder French patent No. 772,173, Sutherland United States patent No. 1,563,-408, Weiller Swiss patent No. 218,660, Hajdu Hungarian patent No. 121,953, Philips Argentine patent No. 54,332, Werner United States patent No. 600,-299, and Biro United States patent No. 2,258,841.

41. Feder French Patent No. 772,173 of 1934. This patent proposes a ball pen point structure which no one in more than twenty-five years since its issuance has ever been able to make any use of. It taught the writing instrument art nothing of any value.

In the Feder patent the socket for the ball and the manner in which the ball is mounted in the socket is wholly unlike what is taught in the '636 patent. The socket is a cylindrical opening, with a conical bottom and with a central feed duct which opens into the socket at the conical bottom. The rim which keeps the ball from coming out is crimped over and may be of prong-like form, that is to say with slits or separations which are distributed around the edge of the rim, much like in the ordinary jewel setting. The ball, instead of being snugly held within this socket, is purposely loosely held in the socket so that it can shift laterally in the socket in order to permit the ink, which is thin ordinary aqueous ink, to get around the ball when the pen in writing is held at a normal writing angle, at which angle the ball will be shifted off to one side.

Feder tells in his specification how this pen is supposed to work, and in particular how he allows the ink to pass around one side of the ball in the oversize socket in which it is caged when the ball is shifted to the other side. When the pen is used in writing the ball is supposed to assume an off-center position within the

socket so that the ink can pass across one side of the conical seat and along one side of the ball, through the gap which is opened by the shifting of the ball (Fehling T. 1558–1563).

The Feder patent does not disclose any of the '636 patent features enumerated above nor any combination of such features as disclosed and claimed in the '636 patent. With respect to the first enumerated feature—the Feder point has no circumferentially spaced spherical ball seating sections at all nor any spherical ball seating sections which are wholly surrounded by ink passages. As the Feder point has no spherical seat sections it does not have the second enumerated feature, that is to say it does not have any ink channels between any such sections, nor any ink channels which branch off from a central feed duct and end forwardly of any such seat sections. With reference to the third enumerated feature, while Feder shows what might be termed an annular ink holding cavity about the ball that cavity merely confines the ball loosely to limit its sidewise movement, is not located forwardly of any spherical seat sections and it does not have opening into it between any spherical seat sections any ink channels. Feder shows a single centrally arranged feed duct behind the ball, as referred to in the fourth enumerated item, but again there are no spherical seat sections in front of it, nor are there any ink channels between any such spherical seat sections, much less any which branch off from the central feed duct and discharge into any annular cavity which is located in front of any spherical seat sections.

■ This Feder patent, like all of the prior art patents which defendants have relied on, not only against the '636 patent but also against the '229 and '896 patents, is a "paper" patent. In addition, it is, like the majority of said prior art patents, a foreign patent. The disclosures in foreign patents when asserted against a patent are strictly construed and are restricted in their teaching to exactly what they clearly and fully disclose, without alteration.

Everyone in the United States has always been free to make and sell what is disclosed in the Feder French patent, but no one, including defendants, has ever done so. Defendants instead found it necessary to appropriate the teaching of the '636 patent in order to put on the market a commercially acceptable pen.

42. *Sutherland United States Patent No. 1,563,408 of 1925.* In this patent the ball is pressed forwardly against the sharply inturned edge of the front rim of the device by a forwardly spring-pressed follower. The follower contains a concave socket which is curved on a smaller radius than the ball, and the extreme inner edge only of the rim of the socket in the follower is intended to engage with the ball, in line contact with the latter, which line is interrupted at intervals by the provision of grooves in the front face of the rim.

By referring to the four above mentioned features which are combined in the point organization of the '636 patent, it will be seen that in the Sutherland device there are no spherical ball seating sections. Sutherland in his device (which was intended by him to be used as a large marking instrument to replace a crayon or brush) was concerned only with providing an arrangement in which the sharply edged recessed member which engages with the ball is pressed forwardly but yieldingly by a spring—which idea is completely foreign to Biro's teaching and has never been used by defendants or anyone else notwithstanding the fact that the patent expired in 1942 and has since that time been free for anyone to use.

43. *Weiller Swiss Patent No. 218,660 of 1939.* In this foreign patent Weiller proposed to make a ball pen in which the ball could be readily removed and exchanged, and in which the ball is supported by a separate similarly removable insert. The ball is seated in a circumferentially continuous spherical seat which is formed in the front end of the insert. By making the insert of a different shape from the bore in which it is

positioned (i. e., triangular, square or star-shaped) a plurality of relatively small side openings are provided between the sides of the insert and the bore, and the ink is supposed to get to the ball, not between any circumferentially spaced spherical seat sections but rather through these side openings.

In the Weiller point there are no channels which extend forwardly from any centrally located feed duct between any circumferentially spaced spherical seat sections, as disclosed and claimed in the '636 patent.

Practically the very same idea which Weiller proposed, namely, that of feeding the ink to the sides of the ball through a number of passages arranged in a circle about a circumferentially continuous spherical seat, was disclosed in another of the references which were made of record in the file history (PX 4) of the '636 patent, namely, Forsell United States patent No. 1,257,971 of 1925 (included in PX 4a).

No one has ever been able to make any use of the Weiller disclosure, even though it has been available to everyone in the United States since its issuance. It does not teach the organization of features which characterizes the '636 patent.

Referring back to the previously enumerated features disclosed in the '636 patent—Weiller does not have the first feature—namely, a plurality of circumferentially spaced spherical ball seating sections, which sections are wholly surrounded by ink passages. Nor does Weiller have any single centrally arranged feed duct which opens into the socket behind the ball, from which feed duct channels between any circumferentially spaced spherical seat sections branch off. At most Weiller has nothing in common with the Biro seat organization except for an annular cavity about the ball —which cavity is in and of itself old in a number of prior art patents.

The Weiller patent never contributed anything to the art, and the ideas disclosed therein have never been used in any commercially acceptable pen. Like the previously discussed Feder French patent, this Weiller patent is a foreign publication and can only be construed as teaching exactly what it shows and nothing more.

44. *Hajdu Hungarian Patent No. 121,953 of 1938.* This is a foreign patent which is so vague and contradictory in its disclosure as to defy exact ascertainment of just what the patentee may really have had in mind. The language used in the specification of the patent is poor, ungrammatical and in some respects contradictory, particularly with respect to what is shown in the drawing, but what is shown in the drawing is sufficient to give some idea of what the patentee had in mind, although the drawing obviously was not made by anyone with any great amount of knowledge of the rules of drafting.

The drawing in this patent shows a completely spherical socket for the ball, which socket extends forwardly from a central ink feeding duct at the bottom of the ball all the way to the extreme front edge of the rim, in forwardly continuing conformation with the ball and without any annular cavity about the ball. The drawing also shows a U-shaped groove which starts at the feed duct beneath the socket and continues upwardly in the opposite sides of the socket to and through the rim, where aqueous ink from the feed duct flows out from the ends of the groove beyond the rim directly onto the exposed surface of the ball.

The specification says that this groove becomes progressively "shallower," which is construed as meaning of progressively less cross sectional area. As the longitudinal section through this groove in the drawing clearly shows the groove as being of uniform width crosswise of the same all the way up to and through the tip, any progressive "shallowing" or reduction in cross sectional area would have to be by progressively narrowing the groove as it extends upwardly. Based on what is shown in the drawing and what is said in the specifica-

tion Dr. Fehling made up and described two large illustrative plaster models (PX 181 and 182), one being split down through the center and the other being made in one piece. He also submitted a drawing (PX 183) showing again his understanding of what Hajdu probably intended to disclose. He also submitted the best he could obtain in the way of a translation (PX 180). The defendants offered nothing in the way of testimony or exhibits with respect to their views as to what Hajdu had intended to disclose in the patent.

Referring back to the features combined in the '636 patent as previously enumerated, it is evident that the Hajdu patent does not disclose the seat organization of the '636 patent or anything suggestive of it. The Hajdu structure has no spaced spherical ball seating sections which are surrounded by ink passages. In Hajdu the sides of the spherical socket on opposite sides of the U-shaped groove extend all the way to the front edge of the rim and there is no annular cavity in front of them.

The ink channels provided by the U-shaped groove extend right out through the rim, and do not end in the socket, much less discharge into any annular cavity within the socket. There is no annular ink holding cavity in the socket, much less one which is located forwardly of the seat sections. The central feed duct does not discharge ink through the branches of the groove into any annular cavity but instead discharges the ink exteriorly of the socket directly onto the protruding portion of the ball.

The Hajdu structure is something which no one ever employed in any ball pen, notwithstanding the fact that it, if operable, could have been used by anyone in the United States for the last twenty-two years. The Hajdu patent is not only a paper patent but a foreign one. Whatever might be said to have been attempted in the way of a disclosure in this Hajdu patent has no relevancy to what is disclosed and claimed in the '636 patent.

45. *Philips Argentine Patent No. 54,-332 of 1942.* The disclosure in this patent (another foreign patent) is quite similar in some respects to the disclosure in the Weiller Swiss patent, also to the disclosure in the Forsell file history reference referred to in connection with the Weiller patent.

In the Philips patent the ball is supported in a plain spherical seat which is formed in the front end of an insert, and the insert is so shaped with respect to the opening in which it is mounted that a plurality of relatively very small side openings are provided, which side openings are relied on to feed the ink forwardly to the sides of the ball. As in the Weiller patent, the cross sectional area of these side openings in a device of conventional fountain pen size would be so minute, even with respect to the size of the ball, as not to afford adequate feeding.

This Philips patent does not utilize the novel combination of features taught by the '636 patent. It does not have even the first enumerated feature, i. e., it does not have a plurality of circumferentially spaced spherical seat sections, much less any spherical seat sections which are spaced apart by channels which extend from any central ink feeding duct beneath the ball between any such sections. These features are not present or suggested by anything in the Philips patent. This patent is again nothing more than a paper patent.

46. *Werner United States Patent No. 600,299 of 1898.* This patent illustrates a complex multi-part structure which would be extremely difficult to manufacture except in the large size shown; and it operates in a manner substantially different from what is disclosed and claimed in the '636 patent. In this Werner patent the ink is supposed to be metered in very small quantities from a large tank type reservoir into a compartment which is located in front of the reservoir and behind the seat for the ball, the metering being accomplished either through one or more very fine ori-

fices which are located in the separating partition or else past a ball in a spring-pressed ball check valve located in that partition.

The ball which is to do the writing is held in place by the rim of a nipple which is screwed onto the member in which the separating partition is provided, and the ball rotates on the sharp edge of a circular opening in still another flat faced member, purposely in only line contact with such edge (note in this connection claim 1 of the Werner patent), and which edge is interrupted at intervals by grooves to permit the ink which has been metered down into the compartment behind the socket to reach the surface of the ball. Werner proposed to use a soft ball, such as one made of rubber or other material, and he proposed to bring this ball into line contact with the sharp inner edge of the flat circular base member by screwing the nipple into place.

This patent is apparently what defendants considered to be their best reference, judging by the fact that they deemed it desirable to make up a model of what is shown in the same (DX 525), but what is shown in that model is not the point organization of the '636 patent. This patent is one of those which was expressly considered by the Patent Office and made of record in the file history.

The Werner patent does not disclose the novel combination of features which characterize the point organization of the '636 patent.

47. *Biro United States Patent No. 2,258,841, Issued October 14, 1941.* The remaining patent which defendants have cited as anticipatory of the point organization disclosed and claimed in the '636 patent is this earlier patent of Mr. Biro's (PX 26, also DX 517). The particular application for that patent was filed by Mr. Biro in 1941 but the point disclosed in that patent is identical in every respect with the one disclosed in Biro patent No. 2,265,055 (DX 514), the application for which was filed in the United States in 1938. The point disclosed in Mr. Biro's '841 patent shows what Mr. Biro unsuccessfully attempted in 1938.

In the point structure disclosed in the '841 patent the ball is positioned in a fairly wide flat bottomed socket, into which socket the ink is fed through a centrally arranged duct. The ball is retained in the socket by a sharply inturned rim, in line contact with the ball, and the ball rests at the bottom of the socket on the sharp circular edge of the front end of the feed duct, in line contact only with the latter. The ink is fed through the feed duct to the ball under substantial pressure, which pressure is intended to unseat the ball and move it forwardly just enough to permit the ink to pass out of the feed duct and into the annular cavity surrounding the ball.

The pen shown in this patent, including the socket organization, was tried out in Argentina but it was a complete failure and was abandoned (T. 139). This patent does not disclose Biro's later conceived point organization as disclosed and claimed in the '636 patent. Referring back to the combination of above enumerated features in the '636 patent, this earlier Biro patent does not disclose any circumferentially spaced spherical seat sections, nor does it disclose any channels separating any such seat sections and extending from the feed duct forwardly beyond such seat sections.

48. It is evident from the disclosures in each of these seven above explained prior art patents that none of them suggests the novel combination of interacting features which Biro conceived of and disclosed and claimed in the '636 patent.

Some of these prior art patents show piecemeal and separately, as pointed out above, some of the features which Biro so successfully combined, but no one before Biro had appreciated how those features could successfully be combined to provide a satisfactorily operating and commercially acceptable ball point organization.

In order for one to defeat a meritorious patent it is not enough to pick

out isolated features in earlier prior art patents, combine them in one particular way with hindsight acquired only from the patent under attack, and then say that no invention would have been involved in selecting those particular features and combining them in the particular way in which the patentee did.

Every one of the patents which defendants have relied on against the '636 patent is a paper patent, and none of them has ever made any impression on the writing instrument art. The Courts have consistently held that a prior art patent which has not contributed anything to the practical art should be strictly construed with respect to whatever teaching may be found in the same.

49. The amendments made to the application which matured into the '636 patent were explanatory of the drawings as originally filed, and do not amount to new matter. This same decision was reached by the experts in the United States Patent Office, since the amendments were permitted.

50. Spherical ball seating sections of substantial area were disclosed in the application for the '636 patent as originally filed in the United States Patent Office. Certain of the original claims referred to these sections as "sectors".

51. The area of the spherical ball seating sections is not critical, the cross-sectional area of the central feed duct is not critical, the size of the annular cavity is not critical, and the depth and cross-sectional dimensions of the grooves or channels are not critical (Fehling 1829–1831, 1877–1892).

52. The '636 patent shows, in Fig. 2, that the rim portion of the socket engages the ball through a substantial area in the vicinity of the lip of the socket adjacent to the equator of the ball. The written description in the patent does not indicate otherwise. Nor are the claims limited to the absence of a large area lateral seat at the rim portion of the socket, and the defendants' contention that the disclosure and claims of the '636 patent are limited to an arrangement in which the rim contacts the ball at only an annular line is without merit.

53. The defendants' contention that a ball pen cannot operate successfully unless it includes an equatorial lateral seat of the type disclosed in British Patent No. 609,817 (DX 614) is also without merit. The pens made and sold by Biro in 1943 were a success and wrote satisfactorily and models closely approximating the seat of the '636 patent were demonstrated at the trial and operated satisfactorily. Moreover, as shown in the microphotograph (PX 112) of the seat of the Type A Fisher cartridge, there was no equatorial lateral seat employed in that Fisher pen like the one disclosed in the above-mentioned British patent and yet that Fisher pen operated satisfactorily and large numbers were sold commercially by defendants.

54. The oath filed by Biro in his application for the '636 patent was not fraudulent, and no acts express or implied were taken by him or his attorneys during the prosecution of this application before the United States Patent Office which were fraudulent in nature or which would in any way restrict the normal meaning of the language of claims 1, 2, 3 and 6–11, inclusive.

55. Against the asserted claims of the '229 patent (and also against those of the '896 patent) defendants have relied on the following prior art as anticipatory: Wiseman British patent No. 12,262, Alkovitsky French patent No. 800,851, LaForest United States patent No. 1,980,625, Lambert British patent No. 21,747, Buttner German patent No. 8,168, and a Thompson item.

56. Taking up first the '229 patent—this patent is the first and the basic patent on the continuous ink vein reservoir concept. It teaches that which all present day ball pen manufacturers (with the exception only of those who use in comparatively small numbers the more recently invented large capacity reservoirs such as that of the Henriksen patent (DX 640)) employ.

The important features of the continuous ink vein reservoir as taught by this '229 patent are as follows:

(1) The provision of a ball which is rotatably mounted in a socket;

(2) the provision of a relatively fine feed duct adjacent the ball for supplying the ink to the ball;

(3) the provision of an ink holding conduit behind and connected with the feed duct, which conduit contains the entire reserve supply of ink;

(4) the provision that this conduit be open to atmospheric pressure at its rear end; and

(5) the provision that this conduit be of such small cross section that the ink—which is preferably of a thick, dense, viscous or adhesive nature, as distinguished from the ordinary aqueous kind of ink used in nib type fountain pens—forms a continuous ink vein which will not move freely in the conduit in either direction under the influence of gravity alone.

57. *Wiseman British Patent No. 12,-262, of 1914.* This patent discloses a device which is intended for use in marking boxes, parcels and the like with a thick or heavy line, after the fashion of a crayon or brush.

Wiseman proposed the use of a large diameter tank type reservoir, in the form of a cylinder, for supplying the marking fluid to the ball. A large form of the device is shown in Figs. 1 to 3, inclusive, while a smaller form is shown in Fig. 4. In both forms the ball is held in a cage-like enclosure at the front end of the cylinder and is separated from the cylinder by a thin perforated screen-like disk, through the perforations in which the marking fluid is fed from the reservoir to the ball. The ball is made, in the larger size of the device, of rubber and in the smaller size of metal. The screen-like disk behind the ball is flexible and yieldable, and a certain amount of rearward movement of the ball and disk is supposed to take place when pressure is applied to the ball during marking.

The cylinder in both forms is completely sealed at its rear end, and the air which is needed in the cylinder to replace the marking fluid as the latter is used up is intended to come in from the front end of the device past the ball into the cylinder.

The cylinder is obviously not intended to be of any capillary cross sectional area. It is only intended to confine the marking fluid between its closed rear end and the perforated disk while permitting the fluid to freely move back and forth in seeking its own level in the cylinder.

If the cylinder in the smaller size were to be reduced in its cross sectional area to a point where it might then be argued to be of capillary size, which was obviously not what Wiseman had in mind, it could not without material change function as the continuous ink vein reservoir of the '229 patent functions because of there being no air inlet at the rear end of the cylinder. And even then it would be of a miniature size, on the order of a toothpick, which quite evidently Wiseman never contemplated. To prevent the writing fluid from running out of the front end of the device —which it could do because of the fact that the replacement air is intended to enter at that end—Wiseman found it necessary to provide a separate cap for sealing off the front end when not in use.

The tank type cylinder of the Wiseman device does not suggest what is disclosed and claimed in the '229 patent. While it has a ball rotatably mounted in a socket, the large cylinder behind the ball which contains the supply of marking fluid is purposely sealed off at its rear end, and it is clearly not of such small cross sectional area as to maintain the marking fluid in the form of a continuous ink vein.

The reservoir disclosed in this Wiseman patent is the same kind of large diameter, free-flow, level-seeking reservoir as those shown in each of a large number of other prior art patents, including the reservoirs in Alkovitsky

French patent No. 800,851, Forsell United States patent No. 1,527,971 and La-Forest United States Patent No. 1,980,-625—all of which prior art patents were considered and expressly made of record in the file history of the '229 patent (PX 5 and PX 5a).

58. *Alkovitsky French Patent No. 800,851, of 1935.* This patent, like the Wiseman British patent just discussed, discloses a large diameter tank type container for the ink, in which the container itself is of such size as to provide the pen-size handle with which the device is intended to be held and manipulated.

In the Alkovitsky device the ink in the container, which again is ordinary thin aqueous ink, is held as in any tank type reservoir and is free to flow back and forth in seeking its own level. The small capillary tube which extends down through the center of the container, which defendants have singled out and endeavored to construe as the reservoir for the ink, is not the reservoir and is not intended to be. It is merely an air venting means. It serves no purpose other than to let air into the container to replace the volume of ink which is used up during writing and to prevent the ink in the container from running out the rear end of the latter.

This Alkovitsky patent does not disclose anything suggestive of the small continuous ink vein reservoir of the '229 patent. This patent again is, like the Wiseman patent and most of the others relied on by defendants, not only a foreign patent but a paper one. It was expressly made of record (PX 5 and PX 5a) during the prosecution of the application for the '229 patent.

59. *LaForest United States Patent No. 1,980,625, of 1934, also Lambert British Patent No. 21,747, of 1891.* These two foreign patents were only briefly referred to by defendants. Both of them were file history references in the '229 patent, and both of them disclose much the same idea. The LaForest patent shows a large diameter tank type reservoir for aqueous ink in which, as in the previously discussed Alkovitsky

patent, special air venting means are provided in the form of a small air tube, which tube runs down through the center of the container for the ink. In the Lambert patent the same thing is disclosed, namely, a large diameter tank type container for the ink, which container is similarly vented by means of an air tube which runs down through the center of the container. Neither of these two patents contains any suggestion of the continuous ink vein reservoir which Biro taught.

60. *Buttner German Patent No. 8,-168, of 1879.* This is a very old foreign patent. It proposes holding the ink to be used for writing in a large diameter tank type bulb near the front end of the device. The entire device is made in one piece of glass, and the long handle portion is hollow only for the purpose of permitting one to suck the ink from an ink bottle up into the bulb. The handle portion is not a reservoir and was not intended to be used as a reservoir.

The ink is free to move around in the bulb, as in any tank type reservoir, but is supposed to be prevented from running out of the bulb back through the tubular handle by a restriction which is located at the rear end of the bulb. Forwardly of the bulb there is no writing ball. The ink is instead supposed to flow out through a very fine hole in the front end.

This patent does not teach what the '229 patent discloses and claims. Aside from being a foreign patent it is, like all of the other prior art patents relied on, a paper one.

61. *Thompson Item in 1906 Publication.* This item shows precisely the same sort of thing as is shown in the old Buttner German patent just discussed.

In the Thompson device, as in the device of the 1879 Buttner German patent, the ink which is to be used in writing is held in a large diameter tank type bulb and is prevented from leaking backward into the handle of the device by a restriction at the rear end of the bulb, which restriction is of capillary size and

continues to the rear end of the handle. In front of this bulb, as in the Buttner device, a very fine hole is provided, through which the ink will run out onto the paper. The only purpose of the small capillary size opening which extends rearwardly in the handle from the ink holding bulb is to enable one to suck up ink from a bottle to fill the bulb. In another form a mechanical suction means is provided for the same purpose.

This 1906 item discloses something which is far removed from the teaching in the '229 patent.

62. Nothing in any of these several prior art citations has any bearing on the novel continuous ink vein reservoir concept which Biro taught in the '229 patent. Every reservoir in every one of these prior art references is without exception a tank type reservoir in which the ink, instead of being held in the form of a continuous vein which will not move freely under the influence of gravity alone, is confined in a relatively large diameter container, either in the form of a cylinder or a bulb, in which the ink is free to move around to seek its own level in the container when the position of the reservoir is changed, as by being inverted. Not one of these prior art patents contains any suggestion of what Biro conceived of and disclosed and claimed in the '229 patent. The asserted claims clearly differentiate from what is shown in any of them.

63. The '896 patent discloses a ball point pen reservoir which is structurally quite different from and a new and patentable improvement over the form of reservoir shown in the '229 patent, also over the reservoirs shown in the previously discussed patents which were cited against the '229 patent. It operates on the same basic continuous ink vein principle as the '229 patent but, unlike the '229 patent, the reservoir is a simple open-ended tube, which tube is separate from the surrounding portions of the pen and is fixedly attached only to the ball pen point whereby to provide with the point a self-contained cartridge which can be removed or inserted as a separate unit in the casing of the pen.

64. The asserted claims of the '896 patent, of which claim 14 is illustrative, set forth in considerable detail these improved features, and the teaching in the patent is adequate to enable anyone skilled in the art to practice the invention.

What is disclosed in the '896 patent is a novel structural organization. It is different from and a patentable improvement over the structure which Biro used by way of exemplification in his '229 patent in illustrating his basic continuous ink vein reservoir concept. The '896 patent utilizes that concept but does so in a different and patentably distinct way.

This particular structural organization was used, exactly as shown in the '896 patent, in the millions of ball pens which were made and sold in Great Britain and about which Mr. Martin testified.

This novel structure is not disclosed in either the specification or drawings of the '229 patent, and it is not shown in any of the prior art patents on which defendants have relied against either the '229 patent or the '896 patent.

65. The prior art patents which defendants have additionally relied on against the asserted claims of the '896 patent are: Kind German patent No. 491,841, Price United States patent No. 558,311 and Biro United States patent No. 2,258,841.

66. *Kind German Patent No. 491,841, of 1930.* This German patent does not disclose a ball pen. Instead it proposes a wick-type writing device in which the point for the wick and the tank type reservoir for the writing fluid behind the wick are removably mounted in an outer casing provided with a closure cap. By referring to claim 14 it will be evident that the combination of features called for by that claim is not present or suggested in the Kind device.

67. *Price United States Patent No. 558,311, of 1896.* This patent discloses

an ordinary nib type fountain pen which is provided at its front end, beyond the nib, with an attachment for converting the pen into a "shading" pen. It has no bearing on the improvement disclosed by Biro in the '896 patent.

68. *Biro United States Patent No. 2,258,841, of 1941.* There is nothing in common between what Biro disclosed in the unsuccessful pen of his '841 patent and what he later disclosed and claimed in the '896 patent.

69. These three prior art patents, which are all paper patents, do not disclose, either separately or in combination, the novel structural organization specified in the asserted claims of the '896 patent. Defendants have apparently relied on these patents only to show that in entirely different kinds of writing instruments the working parts of the pen have been separable from the casing parts, but this idea in and of itself was old in connection with many of the oldest nib type pens.

Just because the improved structural organization disclosed in the '896 patent utilizes the basic continuous ink vein reservoir concept of the '229 patent does not detract from the patentability of the improvement disclosed in the '896 patent. Most of the patents which have been favorably adjudicated of recent years have utilized previously known basic concepts but have disclosed and claimed improvements utilizing those concepts—and that is what Biro did in his later filed but co-pending application which resulted in the '896 patent. The Patent Office recognized that what Biro disclosed and claimed was patently distinct from what Biro had disclosed in his '229 patent.

70. Types A, B, C and D of the Fisher pens and cartridges and the pens and cartridges made by Paul C. Fisher prior to 1954, utilize the principles and features taught by the '229 patent and are covered by claims 12–21, inclusive, thereof. Types A and D and the bullet type pen made by Paul C. Fisher prior to 1954 (Fisher 929) also utilize the principles and features taught by the '896 patent

and are covered by claims 4 and 11–14, inclusive, thereof. Defendants now infringe and have in the past infringed claims 12–21, inclusive, of the '229 and claims 4 and 11–14, inclusive, of the '896 patent.

71. The teachings in the '229 and '896 patents are sufficiently clear and specific to enable one skilled in the art to practice the inventions respectively defined in these patents.

72. The '229 patent suggests that the cross-sectional area of the reservoir be no greater than say 5 sq. mm which in a circular conduit means a diameter of about .100 inches. The principle taught by this patent is utilized when a reservoir of but slightly greater cross-sectional area is employed as when the diameter of the same is .105 inches. Even claim 13, which specifically recites an area of less than 5 sq. mm, is infringed under the doctrine of equivalents by defendants' pens and cartridges which use a continuous ink vein capillary type reservoir having a cross-sectional area extremely close to but slightly greater than the area specified in claim 13.

73. Claims 12–21, inclusive, of the '229 patent provide a specific, clear, concise and definite definition of the Biro invention disclosed in the patent.

74. Claims 12–21, inclusive, of the '229 patent are directed to and define a new and patentable combination of functionally cooperating elements which would not have been obvious to one skilled in the art based on a knowledge of the prior art patents and publications introduced in evidence by the defendants.

75. The reservoir illustrated in the '229 patent is generally helical in shape and the purpose of spiraling the conduit, rather than using it in a straight configuration, is solely for the purpose of increasing the ink supply of the pen in which it is used (Martin 125). Similarly, the separate reservoir tube of the '896 patent is folded back upon itself for the sole purpose of increasing the amount of ink which the pen will hold (Fehling 1818).

76. Types A, D, and the bullet type pen of the Fisher devices utilize an open-ended tube as the reservoir, which tube is attached to the ball pen point in such a way as to form a unitary, self-contained structure which is separable from the pen housing, and types A, D and the bullet type pen infringe claims 4 and 11–14, inclusive, of the '896 patent.

77. The '896 patent discloses an invention which is separate and patentably distinct from that of the '229 patent, and the claims of the '896 patent do not read either in terms or in substance on the invention claimed in the '229 patent. The United States Patent Office so found in granting the claims of the '896 patent.

78. Claims 4 and 11–14, inclusive, of the '896 patent provide a clear, concise and definite definition of the invention described therein; and they are directed to a new and patentable combination of functionally cooperating elements which would not have been obvious to one skilled in the art.

79. There is no proof that any acts express or implied, or papers filed during the prosecution of the application before the United States Patent Office which matured into the '229 patent, were fraudulent or would restrict the normal meaning of the language in claims 12–21, inclusive.

80. There is no proof that any acts express or implied, or papers filed during the prosecution of the application before the United States Patent Office which matured into the '896 patent, were fraudulent or would restrict the normal meaning of the language in claims 4 and 11–14, inclusive.

81. The defendant, Paul C. Fisher, in 1948 knew of the '636, '229 and '896 patents and of the failure of others to manufacture and commercialize noninfringing ball point pens and refill cartridges, so he deliberately used the teachings of these three Biro patents in infringement thereof.

82. Paul C. Fisher was orally notified by Eversharp in 1950 of his infringe-ment of the Biro patents (Fisher 984, 985, 1035).

83. Both defendants were charged with infringement of the patents in suit by written notice in December, 1955 shortly before the original Complaint in this suit was filed.

84. Since 1945, when Eversharp acquired rights under the patents in suit, a number of suits were brought for infringement of these patents and Paul C. Fisher, who was active in the ball pen field commencing in 1948, knew of such suits and was aware of Eversharp's intention to enforce its ball point pen patents against infringers.

85. Eversharp, and later Parker, filed infringement suits in order to enforce their legal rights under the patents in suit, but such suits were not brought for the purpose of eliminating or unlawfully controlling competition, or as part of a plan to eliminate or unlawfully control competition, nor is there any evidence of threats of suit for the purpose of eliminating or unlawfully controlling competition.

86. There is no evidence of a history of either plaintiff acquiring all of the important patents in the ball point pen field over a period of years for the purpose of eliminating or unlawfully controlling competition in this field.

87. As of December 31, 1957, Parker, by virtue of an arms' length agreement, purchased all of the assets of the writing instrument division of Eversharp and all of the patents of Eversharp relating to writing instruments, including the patents in suit, which were transferred to Parker as a part of such assets. There is no evidence of any patent pooling arrangement between Eversharp and Parker for the purpose of forcing competitors out of business, nor is there any evidence of a patent pooling arrangement or conspiracy between Parker and Eversharp, or between Parker and anyone else, for the purpose of, or having the effect of, substantially lessening competition in the ball point pen field. Moreover, no ar-

rangement exists or has ever existed between Eversharp and Parker concerning rights in patents and improvements acquired by Eversharp in the future.

88. Neither Eversharp nor Parker has a history or present policy of refusing to license competitors or of coercing competitors to take a license under the Biro patents involved in suit, but each has maintained a completely open license offer to the entire ball point pen industry including the defendants herein. Many competitors have taken licenses and it was only after plaintiffs' patent rights had been clearly violated that litigation was resorted to.

89. The plaintiffs have offered to grant to the defendants a license under the patents in suit. That license, like other licenses which have been offered and granted to others under the patents in suit, sets certain royalty rates per pen or refill cartridge manufactured or sold by the licensee under the licensed patents, which rates decrease substantially when a certain minimum annual royalty has been paid. The effect of this substantial decrease in royalty rate beyond the minimum annual royalty is to encourage larger volume manufacture and sales and, in turn, to encourage competition.

90. Eversharp, as well as Parker, had two general types of licenses,—one permitting the licensee to sell under its own name and trademark, and the other permitting the licensee to sell without any limitation as to the licensee's name or trademark. One royalty fee is required for the first type of license and an increased fee for the second type of license. There is no evidence that the first type of license, permitting sale under the licensee's name or trademark, had any actual restrictive effect on the sales of licensed ball point pens and cartridges. Moreover, any restrictions imposed by the licenses of this type are clearly permissive restrictions falling within the lawful patent grant and do not constitute misuse of the patents in suit.

91. The second type of license, which permits the licensee to sell its licensed products with or without the licensee's name or trademark, has been granted and substantial royalties have been paid under it; it is not merely a sham but constitutes a real available commercial alternative to the first type of license. The increased license fee for this second type of license is not prohibitive but is in keeping with the sales of licensed products which might be anticipated by the sale of such products not bearing the licensee's name or trademark.

92. Plaintiffs have never refused to grant a license under the patents in suit to anyone, nor is there any evidence of disparity in the royalty rates provided by such licenses which would favor one class of licensee except insofar as higher volume manufacturers obviously obtain a lower average royalty rate by virtue of the substantial decrease in royalty rate once the minimum annual royalty is exceeded. Plaintiffs have not used the patents in suit for the purpose of driving competition out of the ball pen business. There are no negative covenants in any of the licenses which have been granted under the patents in suit. Plaintiffs have always stood ready and willing to grant licenses to any and all manufacturers, including the defendants here, at substantially the same royalty rate. However, the license agreements are not all identical, either in the royalty rates charged or in the particular patents covered by the licenses.

93. All of the inventive features of the Biro patents in suit reside in the writing units or cartridges per se or in the combination of a writing unit or cartridge with a casing or holder. The claims of the '636 patent cover cartridges per se (including refill cartridges), whether or not such cartridges are sold in a casing or holder. The claims of the '229 patent do likewise. The claims of the '896 patent cover cartridges (including refill cartridges) per se, as well as such cartridges in combination with a holder or casing in which they are adapted to be mounted and used. The evidence clearly shows that the claims of the Biro patents in suit cover cartridges (in-

cluding refill cartridges) manufactured and sold by licensees such as Scripto, Papermate, Wearever (Kahn), Eagle, Anja, Esterbrook and Waterman, and that the royalties paid depend not only on the number of complete pens manufactured and sold, but also on the number of refill cartridges manufactured and sold.

94. Neither plaintiff has engaged in coercive package licensing. While all of the license agreements under the patents in suit do cover all three of the patents, no evidence has been offered of even one instance where a prospective licensee was required to take a license under any one patent in order to get a license under any other patent, and Mr. Christensen, General Counsel for Eversharp, testified that it was Eversharp's policy to include in each license whatever patents the licensee asked for (Christensen 369). Obviously, anyone taking a license would want a license under all of the Biro patents in suit in view of the inventive features covered by them, and also in view of the fact that every commercially satisfactory ball pen since the advent of the Biro inventions has embodied the features of the '636 patent and practically all, except for a few using the large non-capillary type reservoir, has embodied the features of the '229 and '896 patents.

95. The facts disclose no efforts by plaintiffs to control the price charged by their licensees for patented ball point pens or cartridges, or to control the price of such pens or cartridges charged by resale distributors after the first sale of such articles by plaintiffs or their licensees, as proscribed by the Supreme Court in Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852, 854 (1940) and United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942).

96. The record is devoid of any evidence that the patents in suit have been misused by employing them as part of a plan to eliminate or unlawfully control competition, by any instances of tying-in or refusals to license singly or in groups, or by a licensing program which is intended to or has the effect of eliminating or unlawfully controlling competition.

97. The Tefft letter of 1953 to Scripto has no bearing on the issues in this case. It was written long before Parker acquired the Biro patents in suit and concerned patents covering project-retract mechanisms which are not involved herein.

CONCLUSIONS OF LAW.

1. The Court has jurisdiction of the parties and the subject matter and has venue of this action.

2. At the time of filing of the original Complaint in this cause, Eversharp was, and for several years had been, the owner of the patents, Nos. 2,390,636, 2,397,-229 and 2,416,896, involved in this suit.

3. Eversharp, since the filing of the original Complaint in this cause, continued to be the owner of said patents, Nos. 2,390,636, 2,397,229 and 2,416,896, until December 31, 1957, at which time it assigned and conveyed its entire right, title and interest in and to said patents, and each of them, to Parker.

4. Eversharp has been retained as a party-plaintiff in this suit only for the purpose of disposing of defendants' counterclaim filed herein charging misuse of the patents in suit.

5. The equities in this suit are found to be with the plaintiffs, and plaintiffs should prevail over the defendants.

6. Claims 1, 2, 3 and 6–11, inclusive, of United States Letters Patent 2,390,636, and each of them, are good and valid in law and have been and are being infringed by the defendants and each of them.

7. Claims 12–21, inclusive, of United States Letters Patent 2,397,229, and each of them, are good and valid in law and have been and are being infringed by the defendants and each of them.

8. Claims 4 and 11–14, inclusive, of United States Letters Patent 2,416,896, and each of them, are good and valid in law and have been and are being

infringed by the defendants and each of them.

9. A patent is presumed to be valid upon issuance by the United States Patent Office, and such presumption of validity can be overcome only by strong and convincing proof, and such burden is on the defendants. 35 U.S.C. § 282; Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957).

10. The presumption of validity is entitled to greater weight when the principal art relied upon by the defendants has been considered and rejected by the Patent Office. Hunt v. Armour & Co., 185 F.2d 722, 726 (7 Cir., 1950); Lewyt Corporation v. Health-Mor, Inc., 181 F.2d 855, 857 (7 Cir., 1950), cert. denied 340 U.S. 823, 71 S.Ct. 57, 95 L. Ed. 605 (1950); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957).

11. Patentable invention is present unless the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. 35 U. S.C. § 103; Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957).

12. A new combination of old elements whereby a new and useful result is secured may be protected by a patent as surely as a new machine or composition of matter. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 443, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177 (1882); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957); Elgen Manufacturing Corp. v. Grant Wilson, Inc., not reported (D.C., Ill., 1960), affd. 285 F.2d 476 (7 Cir., 1961).

13. Combination claims are not invalid where elements coact to produce a new result exceeding the sum of the functions of the elements alone, no matter whether the elements act simultaneously or successively. Blaw-Knox Company v. I. D. Lain Company, 230 F.2d 373 (7 Cir., 1956); Church of Religious Science v. Kinkead Industries, Inc., 235 F.2d 573, 576 (7 Cir., 1956); Grinnell Washing Mach. Co. v. E. E. Johnson Co., 247 U.S. 426, 432, 38 S. Ct. 547, 62 L.Ed. 1196 (1918); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D. C., Ill., 1957).

14. Failure by those working in the prior art is good evidence that the patentee's contribution was inventive. Pyle National Co. v. Lewin, 92 F.2d 628, 630 (7 Cir., 1937); Elgen Manufacturing Corp. v. Grant Wilson, Inc., not reported (D.C., Ill., 1960), affd. 285 F.2d 476 (7 Cir., 1961).

15. A patented combination cannot be anticipated piecemeal by finding individual features separately in the prior art. Imhaeuser v. Buerk, 101 U.S. 647, 660, 25 L.Ed. 945 (1880); Bates v. Coe, 98 U.S. 31, 48, 25 L.Ed. 68 (1878); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957).

16. Prior paper patents have little, if any, weight on the question of the patentable invention as distinguished from anticipation. Wahl Clipper Corporation v. Andis Clipper Co., 66 F.2d 162, 165 (7 Cir., 1933); Campbell v. Mueller, 159 F.2d 803, 809 (6 Cir., 1947); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957). A prior art patent which has not contributed anything to the practical art, and is thus in the category of paper patents, should be strictly construed with respect to whatever teaching may be found in the same. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 421, 422, 22 S.Ct. 698, 46 L.Ed. 968 (1902); Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401, 404 (7 Cir., 1950), cert. denied 339 U.S. 958, 70 S.Ct. 981, 94 L.Ed. 1369 (1950).

17. Disclosures in prior art foreign patents are strictly construed and are restricted to what is clearly and definitely disclosed therein. Nordberg Mfg. Co. v. Woolery Machine Co., 79 F.2d 685, 687 (7 Cir., 1935).

18. A patent is presumed to be sufficiently clear to satisfactorily ad-

vise the art as to structural details when the Patent Examiner of the United States Patent Office has approved it by issuing the patent. Western States Mach. Co. v. S. S. Hepworth Co., 147 F.2d 345, 350 (2 Cir., 1945), cert. denied 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991 (1945); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957).

■ 19. Assuming that Biro did not understand the theory of his inventions at the time he filed his applications resulting in the patents in suit, such fact would not affect the validity of his patents in suit. Eames v. Andrews, 122 U. S. 40, 7 S.Ct. 1073, 1082, 30 L.Ed. 1064 (1887); Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911).

■ 20. Although this court finds it unnecessary to rely on commercial success in finding the patents in suit valid, the commercial success of the inventions covered by the patents in suit adds strength to their validity.

21. Immediate and resounding commercial success which is continued from the time of introduction of the inventions covered by the patents in suit for approximately seventeen years adds strength to the validity of the patents in suit, even though such success need not be relied upon by this court in holding the patents in suit valid.

■ 22. Commercial success of products fully embraced within the general concepts of an invention may be attributed to the invention notwithstanding that such products include minor mechanical improvements or variations. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 447, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252, 256 (7 Cir., 1960), cert. granted 364 U.S. 926, 81 S.Ct. 353, 5 L.Ed.2d 265 (1960), writ dismissed per curiam, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961).

23. The inventions covered by the patents in suit created an entirely new industry which has grown to a tremendous extent since the introduction of such inventions. The inventions in suit have been utilized by practically all ball pen manufacturers, of which there are many, some licensed under the patents in suit and others not licensed. Commercial recognition of this nature is further evidence of the presence of invention. Copeman Laboratories Co. v. General Plastics Corp., 149 F.2d 962 (7 Cir., 1945); Ray-O-Vac Co. v. Goodyear Tire & Rubber Co., 136 F.2d 159 (7 Cir., 1943) aff'd 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957).

■ 24. Patents are to be liberally construed so as to uphold and not destroy the inventor's rights. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Keystone Mfg. Co. v. Adams, 151 U.S. 139, 144, 145, 14 S.Ct. 295, 38 L.Ed. 103 (1894); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957).

■■ 25. A patent is not limited to the embodiment of the invention shown and described in the specification, since the claims of the patent measure the invention. Smith v. Snow, 294 U.S. 1, 16, 55 S.Ct. 279, 79 L.Ed. 721 (1935); Gray Telephone Pay Station Co. v. Baird Mfg. Co., 174 F. 417, 422, 423 (7 Cir., 1909); Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., Ill., 1957). Having described his invention and shown its principle, a patentee is deemed to claim every form in which his invention may be copied. Simplex Appliance Co. v. Star Can Opener Co., 37 F.2d 491, 492 (7 Cir., 1930).

■ 26. The test of infringement is whether the accused device is of substantially the same structure, does substantially the same work in substantially the same way and accomplishes the same result. One appropriating the principle and mode of operation of a patent, and obtaining its results by the same or equivalent means, may not avoid infringement by making a device different

in form, even though it be more or less efficient than the patented device. Stearns-Roger Mfg. Co. v. Ruth, 62 F. 2d 442 (10 Cir., 1932); Nordberg Mfg. Co. v. Woolery Machine Co., 79 F.2d 685, 692 (7 Cir., 1935).

27. The elements of defendants' accused structures, and each of them, are the full equivalents of the essential elements of the patented inventions as defined by claims 1, 2, 3 and 6–11, inclusive, of patent No. 2,390,636 in suit; they function in the same manner, accomplish the same result in the same way, and infringe claims 1, 2, 3 and 6–11, inclusive, and each of them, of said patent No. 2,390,636.

28. The elements of defendants' accused structures, and each of them, are the full equivalents of the essential elements of the patented inventions as defined by claims 12–21, inclusive, of patent No. 2,397,229 in suit; they function in the same manner, accomplish the same result in the same way, and infringe claims 12–21, inclusive, of said patent No. 2,397,229.

29. The elements of defendants' accused structures, types A, D, and the bullet type pen, are the full equivalents of the essential elements of the patented inventions as defined by claims 4 and 11–14, inclusive, of patent No. 2,416,896 in suit; they function in the same manner, accomplish the same result in the same way, and infringe claims 4 and 11–14, inclusive, of said patent No. 2,416,896.

30. None of the prior art cited by the defendants, taken singly or in combination, in any way negatives the validity or scope of claims 1, 2, 3 and 6–11, inclusive, of patent No. 2,390,636 in suit. None of said references is more pertinent to the validity of claims 1, 2, 3 and 6–11, inclusive, of said patent, No. 2,390,-636, than the references cited by the United States Patent Office experts, and these experts considered said claims clearly patentable by the issuance of said patent.

31. None of the prior art cited by the defendants, taken singly or in combination, in any way negatives the validity or scope of claims 12–21, inclusive, of patent No. 2,397,229 in suit. None of said references is more pertinent to the validity of claims 12–21, inclusive, of said patent No. 2,397,229, than the references cited by the United States Patent Office experts, and these experts considered said claims clearly patentable by the issuance of said patent.

32. None of the prior art cited by the defendants, taken singly or in combination, in any way negatives the validity or scope of claims 4 and 11–14, inclusive, of patent No. 2,416,896 in suit. None of said references is more pertinent to the validity of claims 4 and 11–14, inclusive, of said patent, No. 2,416,896, than the references cited by the United States Patent Office experts, and these experts considered said claims clearly patentable by the issuance of said patent.

33. Discussion of prior art under oath carries more weight than mere argument of counsel.

34. The fact that the Patent Office granted the patents in suit, and each of them, necessarily means that it did not consider any amendments made in the applications for such patents as new matter within the meaning of its rules or of the Patent Laws. The Patent Office is constantly determining and defining what is and what is not new matter, and its rulings on such questions are entitled to special weight. Helms Products v. Lake Shore Manufacturing Co., 227 F.2d 677, 679 (7 Cir., 1959); Elgen Manufacturing Corp. v. Grant Wilson, Inc., not reported (D.C., Ill., 1960), affd. 285 F.2d 476 (7 Cir., 1961); Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Systems Co., 169 F.Supp. 1, 21 (D.C.Pa.1958), affd. 268 F.2d 395 (3 Cir., 1959), cert. denied 361 U.S. 894, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959). None of asserted claims of the patents in suit is based on new matter.

35. The invention defined by claims 1, 2, 3 and 6–11, inclusive, of patent No. 2,390,636 in suit was not obvious to those

**674**

skilled in the art at the time said invention was made.

36. The invention defined by claims 12–21, inclusive, of patent No. 2,397,229 in suit was not obvious to those skilled in the art at the time said invention was made.

37. The invention defined by claims 4 and 11–14, inclusive, of patent No. 2,416,-896 in suit was not obvious to those skilled in the art at the time said invention was made.

38. The disclosure in each of the patents in suit teaches one skilled in the art how to build an operative structure.

39. The normal meaning of the asserted claims in the patents in suit is not restricted by file wrapper estoppel because of any actions taken before the Patent Office in the prosecution thereof.

40. Clearly erroneous statements of counsel, that certain limitations are contained in each of several claims, inadvertently made in remarks accompanying an amendment to a patent application, cannot destroy the clear and express differences recited in such claims. W. F. Burns Co. v. Automatic Recording Safe Co., 241 F. 472, 482 (7 Cir., 1916); See Barrel Fitting & S. Corp. v. American Flange & Mfg. Co., 74 F.2d 569 (7 Cir., 1935); Bassick Co. v. Faultless Caster Corporation, 105 F.2d 228, 231 (7 Cir., 1939); Plax Corp. v. Elmer E. Mills Corp., 106 F.Supp. 399, 418–419 (D.C.Ill. 1952) rev. in part on other grounds 204 F.2d 302 (7 Cir., 1953).

41. None of the oaths filed by the patentee, Biro, in any of the patents in suit was fraudulent.

42. The defendants, and each of them, knowingly, deliberately, willfully and wantonly infringed the asserted claims of the patents in suit, and each of them, and plaintiff Parker is entitled to an award of costs.

43. The asserted claims of the patents in suit, and each of them, are not for an old or exhausted combination as a mere aggregation, but each patentably defines a patentable combination.

44. The claims of patent No. 2,416,896 do not constitute double patenting over what is disclosed and claimed in patent 2,397,229.

45. Plaintiff, Parker, is entitled to an injunction restraining defendants, and each of them, against further infringement of claims 1, 2, 3 and 6–11, inclusive, of patent No. 2,390,636, claims 12–21, inclusive of patent No. 2,397,229 and claims 4 and 11–14, inclusive of patent No. 2,416,896; and plaintiff, Parker, is further entitled to an accounting against defendants, and each of them, for profits and damages occasioned by defendants' infringement of the foregoing patents, for the use made of the inventions by the defendants, and each of them, together with interest thereon and costs of this suit, and plaintiff, Parker, should have judgment therefor and execution thereon.

46. The defense of patent misuse is available only where there has been a misuse of the patents in suit. Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252 (7 Cir., 1960) cert. granted 364 U.S. 926, 81 S.Ct. 353, 5 L.Ed.2d 265 (1960), writ dismissed 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961); Apex Electrical Mfg. Co. v. Altorfer Bros. Co., 238 F.2d 867, 872–3 (7 Cir., 1956); Sperry Products, Inc. v. Aluminum Company of America, 171 F. Supp. 901, 929, 940 (D.C.Ohio, 1959) rev. in part on other grounds 285 F.2d 911 (6 Cir., 1960).

47. Infringement suits which are initiated to protect a lawful patent monopoly, and not as part of an over-all plan to eliminate or unlawfully control competition, do not constitute a misuse of the patents. 35 U.S.C. § 271; Cole v. Hughes Tool Company, 215 F.2d 924 (10 Cir., 1954) cert. denied 348 U.S. 927, 75 S.Ct. 339, 99 L.Ed. 726 (1955), rehearing denied 348 U.S. 965, 75 S.Ct. 521, 99 L.Ed. 753 (1955); Ronson Patents Corp. v. Sparklets Devices, 112 F. Supp. 676, 686 (D.C.Mo.1953); Dollac Corporation v. Margon Corporation, 164

F.Supp. 41, 62–63 (D.C.N.J.1958), affd. 275 F.2d 202 (3 Cir., 1960).

48. A patentee may grant a license for any royalty, or upon any condition, the performance of which is reasonably within the reward which the patentee, by the grant of the patent, is entitled to secure. United States v. General Electric Co., 272 U.S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362 (1926).

49. A license granting the right to manufacture and sell a patented product for use only in a specified field falls reasonably within the reward which a patentee is entitled to secure. General Talking Pictures Corp. v. Western Electric Co., 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81 (1938).

50. The licensing of several patents in a single license agreement does not constitute a patent misuse unless the element of coercion is present, such as where there has been a request by a prospective licensee for a license under less than all of the patents and a refusal by the licensor to grant such a license. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); Sbicca-Del Mac v. Milius Shoe Co., 145 F.2d 389, 399 (8 Cir., 1944); Baker-Cammack Hosiery Mills v. Davis Co., 181 F.2d 550, 572–573 (4 Cir., 1950), cert. denied 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605 (1950); Apex Electrical Mfg. Co. v. Altorfer Bros. Co., 238 F.2d 867, 871–872 (7 Cir., 1956); Carter Products v. Colgate-Palmolive Company, 164 F.Supp. 503, 525–526 (D.C.Md.1958), affd. 269 F.2d 299 (3 Cir., 1959); Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F. 2d 252, 259 (7 Cir., 1960), cert. granted 364 U.S. 926, 81 S.Ct. 353, 5 L.Ed.2d 265 (1960), writ dismissed 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961).

51. A license which, by its terms, continues until the expiration of all of the patents covered by such license, does not constitute a patent misuse, in the absence of a showing of coercion on the part of the patent owner that the licensee accede to such a provision. See

E. R. Squibb & Sons v. Chemical Foundation, 93 F.2d 475, 477 (2 Cir., 1937); Sbicca-Del Mac v. Milius Shoe Co., supra, 145 F.2d 389, 401 (8 Cir., 1955); Chicago Pneumatic Tool Co. v. Ziegler, 151 F.2d 784, 796 (3 Cir., 1945); and of American Securit Co. v. Shatterproof Glass Corp., 268 F.2d 769, 775, 777 (3 Cir., 1959), cert. denied 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157 (1959).

52. Plaintiffs' litigation activity, past and present, has not and does not constitute misuse of the patents in suit.

53. Plaintiffs' licensing programs and sales programs, past and present, have not and do not constitute misuse of the patents in suit.

54. Plaintiffs, and each of them, have not used the patents in suit to restrict competition in violation of any law.

55. Plaintiffs, and each of them, have confined their activities concerning the patents in suit within the patent monopoly afforded by the patents in suit. Neither of the plaintiffs herein has been or is guilty of misuse of the patents in suit or any of them; accordingly, the defendants' counterclaim should be dismissed.

56. Defendants' counterclaim and misuse defense were based on allegations having no justification in fact, and no substantial evidence in support thereof was introduced at the trial.

57. Section 287 of the Patent Code pertains only to damages, and does not preclude the grant of injunctive relief. Goodyear v. Allyn, Fed.Cas.No.5,-555, 6 Blatchf. 33 (Cir.Ct.N.Y.1868); New York Pharmical Ass'n v. Tilden, 14 F. 740 (Cir.Ct.N.Y.1882); Dunlap v. Schofield, 152 U.S. 244, 14 S.Ct. 576, 38 L.Ed. 426 (1894); Horn v. Bergner, 68 F. 428, 432 (Cir.Ct.Md.1895), affd. 72 F. 687 (4 Cir., 1896).

58. It is no defense to the grant of injunctive relief that an infringer has discontinued infringement, and even indicated an intention not to infringe in the future, when he stands ready to resume such infringement at any time. General Electric Co. v. New

England Electric Mfg. Co., 128 F. 738, 740, 741 (2 Cir., 1904); Deere & Webber Co. v. Dowagiac Mfg. Co., 153 F. 177, 180, 181 (8 Cir., 1907); Crier v. Innes, 170 F. 324, 326–327 (2 Cir., 1909); Steinfur Patents Corporation v. William Beyer, Inc., 62 F.2d 238 (2 Cir., 1932); Gould-National Batteries, Inc. v. Sonotone Corp., 130 USPQ 26, 28 (D.C.Ill. 1961).

59. When a corporate officer personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability he is jointly liable for infringement with the corporation. Dangler v. Imperial Mach. Co., 11 F.2d 945, 947 (7 Cir., 1926); National Nut Co. v. Kelling Nut Co., 61 F.Supp. 76 (D.C.Ill.1945).

60. Where, as here, a party forms a sole proprietorship company for the purpose of manufacturing and selling infringing articles, and, subsequently, being well aware of the patents and litigation pending on such patents which is well known throughout the industry, forms a corporation for the sole purpose of continuing such manufacture and sale, which constitutes the exclusive activity of the corporation, and serves as president and general manager of the corporation in personal control of its administration and management, and as the guiding spirit or dominant force or active directing head of the corporation in charge of its operation, he is jointly liable with such corporation. Denomina-

tional Envelope Co. v. Duplex Envelope Co., 80 F.2d 186, 194 (4 Cir., 1935); Claude Neon Lights, Inc. v. American Neon Light Corporation, 39 F.2d 548, 550–551 (2 Cir., 1930); General Motors Corporation v. Provus, 100 F.2d 562, 563–564 (7 Cir., 1938); Marks v. Polaroid Corporation, 237 F.2d 428, 435 (1 Cir., 1956), cert. denied 352 U.S. 1005, 77 S.Ct. 564, 1 L.Ed.2d 550 (1951); Carolyn Chenilles, Inc. v. Ostow & Jacobs, Inc., 168 F.Supp. 894, 898 (D.C.N.Y.1958); Dean Rubber Mfg. Co. v. Killian, 106 F.2d 316, 320 (8 Cir., 1939), cert. denied 308 U.S. 624, 60 S.Ct. 380, 84 L.Ed. 521 (1940); Hitchcock v. American Plate Glass Co., 259 F. 948, 952–953 (3 Cir., 1919).

61. The defendant, Paul C. Fisher, is personally liable for the acts of infringement carried on by himself as well as for the acts of infringement carried on by the defendant, Fisher Pen Co., Inc.

62. The defendant, Paul C. Fisher, did willfully and knowingly participate in, induce, and approve the acts of infringement of the defendant, Fisher Pen Co., Inc., and is guilty of infringement for the acts of Fisher Pen Co., Inc., under 35 U.S.C. § 271(b). Marks v. Polaroid Corporation, 237 F.2d 428, 435 (1 Cir., 1956), cert. denied 352 U.S. 1005, 77 S.Ct. 564, 1 L.Ed.2d 550 (1957); Bewal, Inc. v. Minnesota Mining and Manufacturing Co., 292 F.2d 159 (10 Cir., 1961).

63. All matters regarding notice, patent marking, damages and costs are reserved for further hearing at such time as an accounting against the defendants, as hereinbefore set forth, is had.